NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0211-12T1
            A-3356-13T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

RASHON BROWN,

    Defendant-Appellant.

_____

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MALIK Q. SMITH,

    Defendant-Appellant.

_____

**APPROVED FOR PUBLICATION**

**August 31, 2015**

**APPELLATE DIVISION**

        Submitted (A-0211-12) January 14, 2015;
        Submitted (A-3356-13) March 25, 2015 -
        Decided August 31, 2015

        Before Judges Fuentes, Ashrafi and O'Connor.

        On appeal from Superior Court of New Jersey,
        Law Division, Union County, Indictment No.
        09-04-0281.

        Joseph E. Krakora, Public Defender, attorney
        for appellants (Karen E. Truncale, Assistant
        Deputy Public Defender, of counsel and on

the brief in A-0211-12; Monique Moyse, Designated Council, on the brief in A-3356-13).

Grace H. Park, Acting Union County Prosecutor, attorney for respondent (Kimberly L. Donnelly, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief in A-0211-12; Stephen K. Kaiser, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief in A-3356-13).

Appellant in A-0211-12 filed a pro se supplemental brief.

The opinion of the court was delivered by

FUENTES, P.J.A.D.

We consolidate these two appeals because Rashon Brown and Malik Q. Smith were tried together before the same jury. The jury found both defendants guilty of first degree carjacking and other related offenses. We are compelled to reverse the jury's verdict because the trial judge failed to remove a deliberating juror who disclosed her racial bias to two of her fellow jurors and to the judge.

Specifically, on the second day of deliberations, Juror 4 told Jurors 5 and 12 she was "concerned" and "nervous" because she had seen two African-American men that morning in the neighborhood where she lives. Juror 4 noted, "[t]hey certainly don't live around there, and they don't hang around there." Juror 5, who works in that area, agreed that this seemed strange

because that area "mostly is Italian and White people. There really are no Black people around there." Because both defendants are African-American, Juror 4 feared the presence of two African-American men in her neighborhood may have had some kind of sinister connection to the trial.

Jurors 5 and 12 were sympathetic with juror 4's predicament and suggested she should report her concerns to the Sheriff's Officer who was assigned to secure the jury during deliberations. The Sheriff's Officer informed the trial judge, who then questioned each of the three jurors separately. The judge decided to allow all three jurors to remain on the jury and continue deliberating after they assured him this incident did not have an effect on their impartiality, they would follow the court's instructions on the law, and they would base their verdict only on the evidence presented at trial.

On these facts, we are compelled to reverse. When Juror 4 inferred a sinister conspiratorial purpose from a facially innocuous event, based only on the race of the participants, she revealed a deeply-rooted, latent racial bias that required her removal from the jury. The trial judge erred in permitting her to remain on the jury and continue deliberating merely based on the juror's self-serving denial of racial bias. Her initial instinctive, subliminal association of race with criminality or

wrong-doing far trumped her subsequent assurances of impartiality. In her willingness to come forward and candidly report her misgivings, Juror 4 also revealed her unawareness of how engrained her racial bias was in her subconscious. This incongruity between Juror 4's conscious acts and latent beliefs is one of the most pernicious, unintended aspects of our jury system.

Our pretrial jury selection screening process is designed and intended to detect and filter out jurors who harbor views or beliefs that are per se incompatible with the judiciary's mission to deliver equal justice under law. However, like all things designed by the human mind, the pretrial jury selection process is not perfect. This requires our colleagues at the trial level to be in a constant state of vigilance throughout a jury trial for any signs of racial bias or other extraneous matters that may affect a juror's impartiality. Once a juror's latent or overt racial bias is discovered, the juror must be removed from the jury. Thereafter, the judge must conduct a comprehensive, fact-sensitive inquiry to determine whether the removed juror's odious beliefs are shared by any other member of the jury or has otherwise tainted the remaining jurors to such an extent that a mistrial is warranted.

A-0211-12T1

Furthermore, and independent of this error, the trial judge also failed to take proper measures to determine whether Jurors 5 and 12, who initially shared Juror 4's concern and advised her to report this event to the Sheriff's Officer, harbored similar latent racial biases. As we will discuss and explain in greater detail, infra, the record shows the trial judge also failed to conduct a thorough and probing examination of these two jurors. This failure left unresolved whether Jurors 5 and 12 were capable of discharging their duty to judge the evidence fairly and impartially.

I

On April 2, 2009, a Union County Grand Jury returned Indictment No. 09-04-00281, charging defendants Rashon Brown and Malik Q. Smith with first degree carjacking, N.J.S.A. 2C:15-2, first degree armed robbery, N.J.S.A. 2C:15-1, second degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4a, second degree unlawful possession of a firearm, N.J.S.A. 2C:39-5b, third degree terroristic threats, N.J.S.A. 2C:12-3a and/or N.J.S.A. 2C:12-3b, fourth degree resisting arrest, N.J.S.A. 2C:29-2a, and fourth degree possession of a prohibited

device in the form of a type of ammunition known as "hollow nose"[1] bullets, N.J.S.A. 2C:39-3f.

The same indictment charged Brown with third degree aggravated assault by "knowingly, under circumstances manifesting extreme indifference to the value of human life," pointing or displaying a firearm, at or in the direction of a law enforcement officer, N.J.S.A. 2C:12-1b(9), third degree hindering apprehension in connection with the investigation and prosecution of the crimes of first degree carjacking and first degree robbery, N.J.S.A. 2C:29-3b(4), and fourth degree hindering apprehension in connection with the investigation and prosecution of the crime of third degree aggravated assault, N.J.S.A. 2C:29b(4).

Defendants were tried together over a ten-day period commencing on February 22, 2012, and ending on March 14, 2012. The jury found Brown guilty of all of the charges, except for two counts. The jury acquitted Brown of second degree aggravated assault by pointing a handgun at two police officers, N.J.S.A. 2C:12-1b(9),[2] and fourth degree possession of prohibited

---

[1] Although the Indictment uses the term "hollow point bullet," N.J.S.A. 2C:39-3f describes this type of ammunition as a "hollow nose or dum-dum bullet."

[2] Smith was not indicted for this offense.

ammunition under N.J.S.A. 2C:39-3f. The jury found Smith guilty of all charges except for one. The jury acquitted Smith of the charge of fourth degree possession of prohibited ammunition under N.J.S.A. 2C:39-3f.

The trial court sentenced Brown to serve an aggregate term of twenty-five years, subject to an eighty-five percent period of parole ineligibility and five years of parole supervision as mandated by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The court sentenced Smith to serve an aggregate term of twenty-three years, subject to an eighty-five percent period of parole ineligibility and five years of parole supervision as mandated by NERA. Brown filed his notice of appeal on September 6, 2012. Smith filed his notice of appeal on March 18, 2014.[3]

Brown and Smith are represented by separate appellate counsel and have filed separate briefs. Brown has also filed a supplemental pro se brief raising additional arguments. However, both defendants have raised the issue of racial bias with respect to one juror, and demand we vacate the jury's verdict and remand the matter for a new trial. Because the trial court's error with respect to this one issue is of sufficient magnitude to vitiate the legal viability of the

_____

[3] By order dated April 10, 2014, this court granted Smith's motion to file his notice of appeal "as within time."

jury's verdict as a whole, we need not and specifically do not reach the remaining arguments raised by both defendants.

We recite the following facts from the evidence presented at trial.

## II

On December 11, 2008, at approximately 2:20 p.m., Evelyn Arroyo-Maultsby was inside her brand new, white Infiniti that she had parked in front of her daughter Janna's apartment complex located on Schley Street in the Township of Hillside. She was waiting for Janna, who had gone into her apartment to retrieve something. While she waited, a young man tapped on her car window and opened the door. Thinking he may have been confused, Arroyo-Maultsby grabbed the door to close it, and said, "this is my car." The man told her to "get out of the car" and grabbed the door again. He then told her to get of the car again. It was at that moment that Arroyo-Maultsby asked, "[a]re you carjacking me[?]" The man just looked at her and again demanded that she get out of the car.

Arroyo-Maultsby begged the young man not to do this. She testified she told him repeatedly he was going to ruin his life. At that point, the man opened his jacket and showed her his gun.[4]

---

[4] Based on Arroyo-Maultsby's physical demonstration while she was on the witness stand, the trial judge confirmed for the record
(continued)

Arroyo-Maultsby grabbed her pocketbook and walked out of the car "because once I saw the gun, I knew he was serious." However, the man told her to put the purse back in the car. Arroyo-Maultsby testified this made her angry. Despite the potentially dangerous circumstances, she testified:

> I stomped my feet [as] if he was my kid, and I said, you want my pocketbook too, you're taking my car and you want my pocketbook too. Well, then can I at least have my license now that you're taking my car. And then he said, yes, you could have your license.

In response to the prosecutor's question, Arroyo-Maultsby gave the following description of her assailant:

> A. He was young. He was a Black boy, and he had dreads, and he had his hoodie over his head, and I still was able to see his face.
>
> Q. Tell us about the clothing he was wearing.
>
> A. He was wearing black.
>
> . . . .
>
> Q. How close was he to you when you're outside of the car?
>
> A. Oh, face to face, like my nose to nose, that close. He's just a little taller than me, so I was like here.
>
> Q. Okay. How tall are you?

---

(continued)
that when he opened his jacket, the young man had the gun on the right side of his waist.

A. I'm 5'3", almost 5'4", 5'3 1/2", something like that.

Q. What was your observations about the height of the person that you're speaking with?

A. Maybe 5'8", I guess. He was taller than me.

The witness also described her assailant as a young Black man, with black hair, and no facial hair.

When this brief harrowing encounter ended, Arroyo-Maultsby began walking toward the front of her daughter's building. As she approached, she saw her daughter standing there. Arroyo-Maultsby motioned to her daughter to remain where she was because she was afraid of what could happen to her if she made any kind of movement. However, Arroyo-Maultsby mouthed the words "9-1-1" to her daughter, but Janna signaled she did not have a cell phone. Arroyo-Maultsby then saw the young assailant get into her car. As he backed up the vehicle, she turned around and saw a second man walking around the car. At that moment she realized this second man was waiting to get into the passenger seat of her car. The two men drove away, heading south towards Route 78.

A-0211-12T1

Arroyo-Maultsby called 9-1-1 immediately thereafter to report the carjacking.[5] Several police officers from the Hillside Police Department arrived at the apartment complex within minutes. Detective Michael D. Ricci, Detective Peter Corvelli, Detective James Holmes, and Lieutenant Matthew Ross left the police station and set out toward the scene of the carjacking at Schley Street. While en route, they learned over the police radio that the Infiniti had left the scene and was heading towards Edwin Place in Newark. The previous week, the Hillside Police Department recovered a carjacked vehicle near Edwin Place.

Lieutenant Ross testified they saw a vehicle fitting the description of the carjacked car when they reached the area of Clinton and St. James Place. After confirming the license plate number matched the plate number of the carjacked Infiniti, Ross testified the police officers executed a "tactical box" of the car, blocking its path in every direction. Ross testified the Infiniti "rammed Detective Ricci's car that was performing the other side of the tactical box."

Once the Infiniti was completely blocked, Ross saw "[t]he driver immediately jump[] out of the car and had in his hand a

---

[5] The recording of the 9-1-1 call was played to the jury without objection from defense counsel.

black semi-automatic handgun." When Ross yelled "gun," the driver "immediately turned and bolted over a fence that was at the house's driveway." Detective Corvelli also testified he yelled "gun, gun," when he saw the driver run from the scene after he stepped out of the boxed-in vehicle. Ross and Corvelli both testified they saw the driver point the gun at them immediately before he fled.

Ross also saw a person jump out of the passenger side of the Infiniti. This person ran between the vehicles towards Ross, "at which time [Ross] grabbed him by his jacket." Ross testified that by grabbing his jacket, it caused him to "[spin] . . . around so we were facing each other. He pulled out of my grasp and ran east on St. James [Place]." The four police officers at the scene immediately began to pursue both suspects on foot. Holmes and Corvelli hopped over the fence and pursued the driver down a driveway and into a yard; Ross and Ricci pursued the passenger. Corvelli testified they lost sight of the driver when he jumped over another fence adjacent to Willoughby Street.

Ross stopped pursuing the passenger when he heard "shots fired" when he was "[m]aybe a house . . . and a half away from the original crime scene." Corvelli also testified to hearing gunshots fired. When Corvelli reached Willoughby Street, he

learned the gunshots had been fired by Detective Holmes. Corvelli estimated he heard four or five gunshots. Holmes had shot the alleged driver of the Infiniti in the foot. This man was subsequently identified as defendant Rashon Brown.[6]

According to Corvelli, in the process of searching the area for Brown, "a lady" motioned to them through a window that "she saw an individual either hide under her porch or go into her porch area." Corvelli yelled to Lieutenant Ross that the driver was hiding in the porch area. Ross, who had been pursuing the passenger down St. James Place until he heard the gunshots, ran back towards Holmes and Corvelli. They eventually found Brown hiding under a pile of clothes on the woman's porch. Brown was taken to the hospital, where he identified himself as Kareem or Kashawn Ledbetter. Ross and Corvelli identified defendant at trial as the driver of the vehicle and the man they apprehended.

Arroyo-Maultsby learned the police had recovered her car while she was still in front of her daughter's apartment complex. She therefore went to the Hillside Police Department

---

[6] Neither the State nor defendant called Detective James Holmes as a witness in this case. The record shows that at the time this case came for trial, Holmes was no longer a member of the Hillside Police Department. As reflected in the colloquy that took place in open court on February 23, 2012, Holmes was charged and convicted of shooting his stepson before the start of trial. Presumably, Holmes thereafter forfeited his position as a police officer, as mandated by N.J.S.A. 2C:51-2.

to submit her formal statement.  Arroyo-Maultsby and her family went to the Newark Police Department the following day to reclaim her pocketbook and sign a form giving her consent for the police to search the Infiniti.  While she was sitting at a detective's desk waiting to complete the consent to search form, Arroyo-Maultsby saw the young man who had carjacked her car being led through the room.  She gave the following account of what transpired:

> A.  While I was waiting for the guy, the police officer to give me -- I believe that was a detective -- waiting to give me the paperwork so I could fill out, I saw a young guy come in, and -- it was just, it was just a coincidence.  [The police officer] said that was the boy that carjacked you.
>
> Q.  Was that person in the same room as you in Newark?
>
> A.  Yeah, he was walking in, and I looked right at him, and he looked right at me.
>
> Q.  And what happened when you made [sic] that realization?
>
> A.  I broke down and told my daughter that was the boy that carjacked me.
>
> Q.  Was your daughter at the Newark Police Department with you?
>
> A.  Yes.
>
> Q.  Ms. Arroyo-Maultsby, is that your daughter Janna, who was with you the day before?
>
> A.  No.

Q. A different daughter?

A. A different daughter.

Q. What is it about the person that you saw in Newark on the 12th of [December] 2008 that you recognized from the carjacking?

A. When he came in and as he was getting closer, I looked straight at his face. He looked at me, and I noticed those eyes, his skin, those dreads, and I just knew it was him.

Q. After you turned to your daughter, did you speak to anybody else about your observation?

A. At first, I didn't realize if anybody heard me. I was just talking to her, and I just broke down.

. . . .

Q. And then did you tell detectives why you were upset?

A. The detectives was asking [sic] me why I was so upset, so I had to tell them.

Q. Ms. Arroyo-Maultsby, do you see the person in court today that you saw at the Newark Police Department on the 12th of December, 2008?

A. It's hard to tell. He's wearing glasses now.

Q. Ms. Arroyo-Maultsby, who is it that you're saying it's hard to tell because he's wearing glasses? Who are you indicating?

A. The one with the dreads. His dreads wasn't [sic] that long.

Arroyo-Maultsby eventually identified defendant Brown as the person she saw at the Newark Police Station on December 12, 2008.  He was the same person who carjacked her car the previous day, December 11, 2008.  Arroyo-Maultsby emphasized no one told her ahead of time she would see the man who the police had arrested and charged with carjacking her car.  She was there only to sign the consent form to permit the police to search her car.

Lieutenant Joseph Zeiser of the Newark Police Department testified he saw Arroyo-Maultsby sitting and talking with one of the detectives when he noticed she became visibly upset.  He walked over and asked her whether she needed any assistance or medical attention.  According to Zeiser, she told him "that was the guy who carjacked me yesterday."  Because Zeiser was not aware of defendant's identity at the time, he asked Arroyo-Maultsby to clarify.  She stated, "the guy who just walked in here with the two officers."

The State also called two expert witnesses as part of its case-in-chief.  Monica Ghannam, a forensic scientist from the Union County Prosecutor's Office, and Thomas Chung, an expert in firearms, ballistics, and tool mark examination.  Ghannam tested three items recovered inside the Infiniti: a pair of gloves, a black and white glove, and a red baseball hat.  She excluded

Brown as a DNA contributor to the red baseball hat and to one of the gloves. Chung examined five handguns, four of which were police service weapons, as well as four spent casings discharged from Holmes' service weapon. The non-police firearm was a Sig Sauer semi-automatic pistol loaded with nine live rounds of ammunition, one of which was a hollow point bullet. Chung found this weapon initially inoperable until he cleaned it. He testified the weapon was fully operable.

Brown testified in his own defense. He was eighteen years old at the time of the carjacking. He denied having had anything to do with the carjacking. Brown testified he stopped to speak briefly with the occupants of the white Infiniti when he noticed the unmarked police cars and decided to leave before they suspected him of being involved in some wrong-doing. He witnessed the unmarked police vehicles "box-in" the white Infiniti. Brown testified he saw two men flee from inside the Infiniti when the police officers stepped out of their unmarked cars with their guns drawn.

From this point, Brown said he ran toward Willoughby Street because he saw Detective Holmes chasing him with his gun drawn. As he jumped over a gate, Brown testified Holmes shot him in the foot. He ran to a nearby house where the police eventually found him. Brown denied ever having a handgun on that day.

Defense counsel also called Jason Glover, a friend of defendant Brown. Glover testified Brown was at his house earlier that day, prior to the arrest. He testified Brown left the house approximately half an hour before Brown was arrested. Glover further testified that about ten minutes before discovering Brown had been arrested, he heard shots. Glover resides on the corner of Aldine Street and St. James Place. Glover was twenty-four years old at the time of trial. He admitted to having prior criminal convictions. At the time he testified, Glover was in a halfway house as part of a four-year sentence he received for a third degree offense.

                                   III

In the process of canvassing the area where the carjacking occurred, Detective Ricci located an individual who claimed to have witnessed Smith get out of the white car. He described Smith as having a tattoo on his left forearm. Ricci and another detective searched the Essex County Jail's website for the name "Malik Smith" and found four matches. Defendant Smith was one of those four matches. Although Ricci did not see the man who ran from the passenger side of the Infiniti, he believed Smith was a viable candidate to include in the photo array because he matched the height, weight, and had a left forearm tattoo.

Approximately one month after Brown's arrest, Lieutenant Ross testified that Detective Ricci told him they had a suspect in the carjacking case. Ricci wanted Ross to look at a photographic[7] array Hillside Detective Nancy Swider had prepared containing six photographs of individuals matching the description of the man Ross saw run out of the Infiniti from the passenger-side of the car on December 11, 2008. Ross testified Ricci did not discuss with him anything about the status of the investigation at that point. Ross also did not speak to Detective Corvelli about any of the individuals depicted in these photographs.

Despite Lieutenant Ross's seniority in the Hillside Police Department and experience as a police officer, Ross testified he told Corvelli to explain to him the process and protocol involved in identifying an individual through this procedure:

> A. Yeah, I said we're not going to cut any corners, I'm actually a witness, not your boss at this point, and we have to do this the proper way. And he went through the whole packet.
>
> . . . .
>
> Q. . . . Lieutenant[,] [a]fter having those instructions given to you, did you sign and

---

[7] Ross used the term "six-pack" to describe a photo array containing six photographs. The prosecutor identified the array as S-92. Ross described it as "a group of six pictures that go inside a wooden box, and you look at the pictures."

date the instruction form with Detective Corvelli?

A. Yes, I did.

Q. And then what happened?

A. Then he gave me that six-pack wooden box there, and I went through each photograph, identifying photo number 3.

. . . .

Q. Now, [Lieutenant] just for the record, you opened window one, closed window one, similar to --

A. Opened two, closed two. Opened three. Yes, each one you have to open, and as per the instructions, you have to close it because, like I said, they don't want you comparing photos and confusing yourself or others, whatever.

Q. And you just returned to number 3?

A. I returned to number 3 and told him it was number 3.

Q. And what is number -- who did you tell Corvelli number 3 was?

A. Number 3 was the guy I grabbed that got away from me when he fled from inside of the highjacked vehicle.

The investigating detectives did not show the photo array to Arroyo-Maultsby or her daughter Janna because neither were able to describe the second individual who was in the passenger side of the car.  Ghannam, the forensic scientist from the Union County Prosecutor's Office, found she could not exclude Smith as

A-0211-12T1

a major DNA contributor in material she recovered from a glove recovered from inside the Infiniti by Detective Ricci. Ghannam also opined she could not exclude Smith as a major DNA contributor to the red baseball hat found in the Infiniti.

Smith did not call any witnesses and did not testify in his own defense. The court denied his pretrial motion to exclude the photo array identification.

IV

Defendant Brown, through counsel, raises the following arguments:

POINT I

THE COURT COMMITTED REVERSIBLE ERROR WHEN IT PERMITTED THE VICTIM TO VIEW THE DEFENDANT'S ARREST PHOTO DURING TRIAL IN ORDER TO ELICIT AN IDENTIFICATION.

POINT II

THE COURT ERRED IN NOT EXCLUDING TESTIMONY THAT THE DEFENDANT WAS APPREHENDED IN AN AREA WHERE A CARJACKED VEHICLE HAD BEEN RECOVERED THE PREVIOUS WEEK. (Partially Raised Below)

POINT III

A DELIBERATING JUROR'S BELIEF, BASED SOLELY UPON RACE, THAT TWO AFRICAN-AMERICAN MEN WHOM SHE SAW IN HER NEIGHBORHOOD WERE CONNECTED WITH THE TRIAL AND MIGHT BE A THREAT TO HER WELL-BEING, WARRANTED EITHER A MISTRIAL OR HER REMOVAL AND THE SUBSTITUTION OF AN ALTERNATE.

POINT IV

THE SENTENCE OF 25 YEARS, 85% TO BE SERVED
BEFORE PAROLE UNDER NERA, WAS MANIFESTLY
EXCESSIVE.

Brown has also filed a pro se supplemental brief in which he raises the following additional argument points:

POINT I

DEFENDANT WAS DENIED HIS CONSTITUTIONAL
RIGHT OF DUE PROCESS TO A FAIR TRIAL WHEN
THE POLICE STAGED EVENT AND TOLD THE VICTIM
THAT DEFENDANT WAS HER ATTACKER AND UNDULY
SUGGESTED THE IDENTIFICATION.

POINT II

THE VERDICT WAS AGAINST THE WEIGHT OF THE
EVIDENCE WHEREFORE THE CONVICTION MUST BE
REVERSED AND THE INDICTMENT MUST BE
DISMISSED.

POINT III

THE DEFENDANT WAS DENIED HIS RIGHT OF A FAIR
TRIAL BY PROSECUTORIAL MISCONDUCT, WHEREFORE
THE CONVICTION MUST BE SET ASIDE AND A NEW
TRIAL AWARDED.

Smith, through counsel, raises the following points in his appeal:

POINT I

THE TRIAL COURT DEPRIVED MR. SMITH OF HIS
RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY
FAILING TO DISMISS A DELIBERATING JUROR FOR
RACIAL BIAS AND FAILING TO VOIR DIRE THE
PANEL ADEQUATELY TO GUARANTEE THAT IT WAS
FREE FROM ANY RESULTING TAINT.

22

POINT II

PROSECUTORIAL MISCONDUCT DURING SUMMATION
DEPRIVED MR. SMITH OF HIS RIGHT TO DUE
PROCESS. (Not Raised Below)

POINT III

THE LOWER COURT ERRED IN ADMITTING EVIDENCE
OF THE IMPERMISSIBLY SUGGESTIVE OUT-OF-COURT
INDENTIFICATION OF DEFENDANT BY LT. ROSS AND
THE RESULTING TAINTED IN-COURT
IDENTIFICATION, THEREBY DENYING DEFENDANT'S
RIGHTS TO DUE PROCESS AND A FAIR TRIAL.
(<u>U.S. CONST</u>. AMENDS. VI, XIV; <u>N.J. CONST</u>.
(1947), ART. I, pars. 1 and 10.)

POINT IV

THE TRIAL COURT'S FAILURE TO CHARGE THE JURY
ON CROSS-RACIAL IDENTIFICATION DEPRIVED MR.
SMITH OF HIS RIGHT TO DUE PROCESS AND A FAIR
TRIAL. (<u>U.S. Const. Amends. V, VI, AND XIV;
N.J. Const. (1947), Art. I, Pars. 1, 9, and
10</u>.) (Not Raised Below)

POINT V

THE TRIAL COURT DEPRIVED MR. SMITH OF HIS
RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY
FAILING TO STRIKE REPEATED TESTIMONY THAT
THE POLICE FOUND THE INFINITI IN AN AREA
WHERE THEY HAD FOUND A CARJACKED VEHICLE ONE
WEEK EARLIER.

POINT VI

THE TRAIL COURT ABUSED ITS DISCRETION BY
IMPOSING A MANIFESTLY EXCESSIVE SENTENCE.

Both defendants raised the manner in which the trial court
handled the disclosure juror 4 made during the second day of
jury deliberations as a dispositive issue in these appeals. We

agree. A comprehensive recitation of the event is necessary, before we address the legal implications of the trial judge's decision.

At the start of the afternoon session on the second day of jury deliberations, the trial judge addressed the attorneys to place the following event on the record:

> THE COURT: Counsel, it is now 1 o'clock. A sheriff's officer approached me during lunch hour and told me that Juror Number 4 spoke to him during the lunch hour and indicated that she saw some men outside of her house today and was inquiring whether it might have anything to do with this case.
>
> Out of an overabundance of caution, my intention is to speak to that juror and ask her what her concerns were, what she saw, and whether what she saw would affect her being able to continue in her deliberations.
>
> Now, the issue becomes, do I do this in open court on the record, or would counsel prefer that I do it chambers, with just counsel and myself present, putting it onto Court Smart so that in case there would be any reticence to speak freely, she might feel more free to speak in chambers. What's your preference, counsel?
>
> [PROSECUTOR]: I think the second option would be more appropriate.
>
> [BROWN DEFENSE COUNSEL]: I would prefer to do it in chambers because I think she would be more free to speak.
>
> THE COURT: [Inquires from Smith's counsel.]

24

[SMITH DEFENSE COUNSEL]: Yeah, I would agree with that. I don't know how complicated it is for . . . the court reporter --

THE COURT: No, we're not going to be able to use [the court reporter].

. . . .

I would put it on Court Smart, and we will record it separately. I'll even set your clients up with earphones, so that they can hear what's being said when we go into chambers.

[SMITH DEFENSE COUNSEL]: Okay. Thank you.

(Recess)

(Voir dire in chambers conducted, [s]tenographically, utilizing the court reporter.)

(Juror Number 4 enters the [c]ourt's chambers.)

THE COURT: Please come on in. Take a seat for a minute. I don't want you to be nervous about this, but I was speaking to my sheriff's officer, and he tells me that you spoke to him during the lunch break today.

JUROR NO. FOUR: Yes, coming back.

THE COURT: And you talked about something you saw this morning.

JUROR NO. FOUR: Yes, I went out at 7 o'clock this morning to get into my car. <u>As soon as I turned the ignition on, two dark Black fellas came out of the park</u>. My car was facing the parking lot that we use, and a lot of people go in and jog. But I have never seen these gentlemen before. One was a very, very tall man, must have been 6['] 4["], 6['] 5["]. And he was carrying

sneakers, and he was hurrying down the street. The other one was sort of an older man, and he was light skinned, but he was Black, you know, lighter skin.

THE COURT: Okay.

JUROR NO. FOUR: <u>And he just stood there. He didn't do anything. I didn't -- I thought I saw him looking at my car, but then he went down the street too.</u>

THE COURT: Did you connect that with this case in any way?

JUROR NO. FOUR: Well, I just said isn't that coincidental, I never saw anybody in the park. And I said to myself, you know, I just don't want to be nervous about this, but --

THE COURT: But would what you saw affect your ability to continue your deliberations in this matter?

JUROR NO. FOUR: No, but <u>I was concerned about my wellbeing. I don't know if, you know, I was going to be stalked someplace, because I mean I don't know these people. They certainly don't live around there, and they don't hang around there.</u> I'm from Union, so . . .

THE COURT: And where in Union do you live?

JUROR NO. FOUR: I live at [a particular point of reference][8] near [the same particular point of reference], one long block in from [the same particular point of reference].

---

[8] We have decided not to disclose the particular point of reference to protect the juror's privacy.

THE COURT: <u>And was there anything that made you connect what you saw today with this case other than the race</u>?

JUROR NO. FOUR: <u>No, not unless because it's a case that they're both Black, and I'm on the case.  And I said, gee, that's funny, you know. I wasn't concerned about it when I first went on the case, but I was wondering if they would stalk you if they're found guilty, whatever, you know, if they would go after any of the jurors</u>.

THE COURT: There's some anonymity in this, in these procedures, and in my experience, that never happens.  I'm trying to put your mind at ease in that regard.  Have you spoken to any of your fellow jurors about this?

JUROR NO. FOUR: I did, you know, when we were going out to lunch.  And they said, well, if you're a little concerned, you could mention it to the police.

THE COURT: Who did you speak to?

JUROR NO. FOUR: I told [Juror 12] and [Juror 5] and the other one.  I forget what her name is, something like . . .

THE COURT: Okay.

JUROR NO FOUR: And she said, well, if you're concerned -- she works right next [door] to where I live, and she said that's not a place where they would hang out.  And so she says, if you'd feel better about it, you could mention it to one of the police officers here.  So that's what I did.

THE COURT: But what happened to you today, that would not affect you continuing your deliberations in this case?

JUROR NO. FOUR: Not really, I guess. You know, not really.

THE COURT: Counsel, do you have any questions of [Juror 4]?

. . . .

[SMITH DEFENSE COUNSEL]: Hi, [Juror 4].

JUROR NO. FOUR: Hi, how are you?

[SMITH DEFENSE COUNSEL]: Fine. Thank you. <u>Are you concerned at all that if the jury comes back with a certain verdict, that there's going to be some bad consequences for you</u>?

JUROR NO. FOUR: <u>Well, that's it, that's what I was thinking of</u>.

[SMITH DEFENSE COUNSEL]: So, you're worried that if --

JUROR NO. FOUR: <u>I was thinking along that line, when I saw that this morning</u>.

[SMITH DEFENSE COUNSEL]: And what are you thinking now, the same way or different?

JUROR NO. FOUR: Well, no, I had it out of my mind. I hope it's okay when I go home and when I go out in the morning. It's not a place where anybody hangs out. It's nothing like that. It's a park. People go in and walk around and jog, and it was kind of early. It was 7 o'clock this morning.

[SMITH DEFENSE COUNSEL]: Okay.

JUROR NO. FOUR: So I thought I would mention it, and it would be a little off my chest. <u>I was just thinking, well, if that does happen or that could happen, if they would bother you or somebody would bother you</u>.

THE COURT:  But what would happen to you in your thoughts, would that affect your decision making, how you might decide this case?  Would you be more inclined to vote one way or the other as a result of that?

JUROR NO. FOUR:  No, because I really think I would vote according to the evidence.  No, I tried to be honest.

THE COURT:  Yes, but you're also --

JUROR NO. FOUR: I didn't fall back on that.

THE COURT: Counsel, do [you] have any further follow up?

[PROSECUTOR]:  No, Judge.

THE COURT: And you say you spoke to [Juror 12]?

JUROR NO. FOUR: And [Juror 5].

    . . . .

JUROR NO. FOUR: [Juror 5] . . . works right next to where I live, and she knows the park, and she said it's not a place where anybody hangs out like that.

THE COURT:  [Juror 4], I'm going to ask you to return back to the jury room.  Don't speak to anybody else about what we spoke about right here.

JUROR NO. FOUR:  Oaky, sure.  Thank you very much, Judge.

    . . . .

(Juror No. Four excused from chambers.)

[SMITH DEFENSE COUNSEL]:  Where should I start?  Now we have to talk to those people.

29

THE COURT: Yes.

. . . .

PROSECUTOR: Well, Judge, I think any time someone sits around and hears about a carjacking, you then become more aware of the way of the world. You can watch an episode of Criminal Minds and go out the next day and think like that.

THE COURT: Counsel, I talk to jurors after [every] trial about customer service issues, and something that is repeatedly asked of me is whether there's going to be retribution, one way or the other, depending on which side they rule. <u>This is something that is intrinsically in every juror's mind potentially. So, I don't have any great concerns about this</u>. Are you asking that [Juror 4] be excused?

[SMITH DEFENSE COUNSEL]: I'm not sure. <u>I mean she seems like a little bit shaken about it. So, I know she's saying it's not affecting her deliberation, but she just seems troubled by it</u>. But I mean, you know, based on -- I mean I'm thinking about the comments that you and [the Prosecutor] made, and I don't know what [Brown's Counsel] thinks, but if everyone is satisfied that she's comfortable.

THE COURT: I think she said she could decide the case based upon the evidence. But she does express, you know, her safety is a matter of concern to her, but there's nothing that she really connects with this case.

[BROWN DEFENSE COUNSEL]: . . . I'm not asking to remove her.

THE COURT: But we will continue the voir dire. All right.

A-0211-12T1

[BROWN DEFENSE COUNSEL]: Yeah.

(Juror No. Three enters the [c]ourt's chambers)

. . . .

THE COURT: [Addressing Juror 3] did you have a conversation today with [Juror 4]?

JUROR NO. THREE:  The older lady?

THE COURT: Yeah.

JUROR NO. THREE: About what she saw?  Yes, yes, we talked about it.

THE COURT: And she told you what she saw, that she saw two Black men outside her home this morning?

JUROR NO. THREE: Actually, the conversation wasn't directly with me.  She was talking with [Juror 12], another juror, but I was right next to them.

THE COURT:  And would what she said affect you in any way in your continuing to deliberate in this matter?

JUROR NO. THREE: No.

THE COURT:  Counsel have any follow up with [Juror 3]?

[SMITH DEFENSE COUNSEL]: No, Judge.

[BROWN DEFENSE COUNSEL]: No.

THE COURT: <u>Is she oaky though?  I worry about her.  She's okay?  Did she do anything else than express what she saw that would cause you concern for her ability to continue</u>?

31

JUROR NO. THREE: <u>She was very concerned, and then when we walked, I was standing behind her, and I told her not to worry about it, I sincerely don't think she needed to be worried that it has anything to do with this case. I think she needed to be assured. She said, are you sure, are you sure. I said I'm pretty sure</u>.

THE COURT: Thank you [Juror 3].

(Juror No. Three excused from chambers. Juror No. Five enters the [c]ourt's Chambers.)

THE COURT: [Addressing Juror 5] were you present at lunch when [Juror 4], Juror Number 4, was having a conversation with another one of your fellow jurors?

JUROR NO. FIVE: Yes.

THE COURT: And she indicated that she had seen something this morning.

JUROR NO. FIVE: She was talking to me.

THE COURT: She was talking to you.

JUROR NO. FIVE: And I said, let the officer know about it. <u>What she said is that she saw two black young men in the park where she lives, at around where she lives</u>. I know the area because I work near where she lives.

THE COURT: You work nearby?

JUROR NO. FIVE: Nearby. The area is just for seniors, and it has like three complexes, and in the middle is like a park, and on the other side is where the YMCA is at. <u>It sounded a little strange perhaps. This area mostly is Italian and White people. There really are no Black people around there</u>. <u>So, she was concerned about</u>

it, and I advised her to let the police officer know about this. She was kind of nervous.

THE COURT: And what she expressed to you, would that affect you in continuing your deliberations?

JUROR NO. FIVE: No, not at all.

THE COURT: Not at all. Counsel have any questions of [Juror 5]?

[PROSECUTOR]: No, Judge.

[BROWN DEFENSE COUNSEL]: No.

THE COURT: Thank you, [Juror 5], I'm going to ask you . . . to go back to the jury room and don't talk to your fellow jurors about what we talked about.

JUROR NO. FIVE: Okay.

    . . . .

[SMITH DEFENSE COUNSEL]: Judge, can we ask this person if they think anybody else heard it, if they have knowledge?

THE COURT: Yeah.

(Juror No. 12 enters the [c]ourt's Chambers.)

THE COURT: Come on in. Hi . . . Please sit. [Addressing Juror 12], [Juror 4] spoke to you on lunch hour about something she saw this morning?

JUROR NO. TWELVE: Yes.

THE COURT: And she expressed to you some concern about what she saw. What she told you, would that affect your ability to continue on this jury?

33

JUROR NO. TWELVE: No.

THE COURT: <u>Did she appear to be reassured when she mentioned it to the sheriff's officer about what she saw? Has she expressed - - or is she in any way acting as if you don't think she's going to be able to continue in her deliberations</u>?

JUROR NO. TWELVE: I think she'll be able to continue. I just think she was shook up a little bit about it.

THE COURT: Was there anyone else present or around? She told us that she was speaking - - I think she said to you, and then [Juror 5] told her, advised her and that [Juror 3] was nearby.

JUROR NO. TWELVE: Yeah, that was it.

THE COURT: Was there anybody else nearby that could have heard it? Counsel have any follow up with [Juror 12]?

[BROWN DEFENSE COUNSEL]: No.

[SMITH DEFENSE COUNSEL]: No.

[PROSECUTOR]: No.

[(Emphasis added).]

The trial judge excused Juror 12 and gave her the same admonition he had given the other three jurors, to refrain from discussing what had transpired with the remaining members of the jury. The record indicates there was a request by the jury for a read back of some testimony. After this concluded, Brown's counsel addressed the judge in open court, but outside the presence of the jury, and moved for a mistrial. Brown's counsel

34

indicated his motion was based on Juror 4's comments, together with the comments made by Juror 5. Alternatively, Brown's counsel asked the court to remove Jurors 4 and 5, and replace them with the two alternates. Smith's counsel joined in both motions. Smith's counsel made the following argument in support of her application:

> I'm concerned - - and I'm also speaking on my client's behalf after speaking to him. I'm concerned about [Juror 5], some of her comments, because it seems like she thought it was very strange as well, and she's not used to seeing Black people in that area. And she's the one, in fact, that told [Juror 4] to say something to the officers. So, I'm just concerned about how, either consciously or subconsciously, that would affect them. So, I would ask that they both be removed.

The prosecutor opposed defendants' applications for either a mistrial or for the removal of Jurors 4 and 5. The prosecutor maintained that Juror 4 specifically declared that the experience she had had earlier that same day did not affect her ability to remain impartial. The prosecutor noted that in "the realities of life and of jury duty . . . you hear facts that, for many people in this box, are not part and parcel of their everyday life."

The trial judge stated, "Prosecutor, I concur with you." The judge again stated how it is his practice to speak to jurors at the end of trials to discuss

customer service issues, things that we could do better in order to make their jobs easier.

. . . .

But the thing that always rings true is that someone always asks about juror safety and whether there's potential retaliation for verdicts, either by the State or by the defense, based upon their findings, and we always try to reassure them. I know that one of the issues with the jury selection method, I always try to tell my jurors to be general in talking about - - for instance, we don't . . . want to know what specific job they work for, but we're looking for general, generic information. We don't want to know where they live. We want to know who lives with them.

So, I think that juror safety, juror anonymity to one extent is one of the growing concerns in the country in terms of jury selection.

[Juror 4] expressed that she saw two people outside of her home today. <u>She didn't connect it in any way whatsoever with this case, except that the two individuals she saw were African-American and that the two defendants on trial are African-American</u>. <u>She made the connection in her mind, and she said she was somewhat concerned about it</u>. [Juror 5] indicates that she works nearby and that she somewhat fed into that concern by saying <u>it might be unusual for there to be two African-Americans in that neighborhood, but speak to the sheriff's officer if you have any concerns</u>.

Both individuals indicated that what was said between them, what was observed by [Juror 4] would have no part, would play no role in their continued deliberations.

36

[(Emphasis added).]

Brown's counsel emphasized that the facts showed Juror 4 saw a possible nefarious connection between the two African-American men in a Caucasian neighborhood and her service as a juror in a case involving two African-American defendants. The judge rejected counsel's argument, stating: "We cannot deal at a jury selection level with subconscious behavior. We tell the jury that we understand that <u>we expect to some extent people have developed certain prejudices, some fixed ways of thinking</u> . . . The fact that they might does not exclude them from service as jurors."

At the conclusion of the read back of certain testimony, the judge addressed the jury in open court:

> I want to make one comment, and I've already ruled on this, but in terms of creating the record, there's been an expression that [Juror 4] -- and also [Juror 5] <u>to a certain extent -- expressed some racial consciousness and potential racism by their comments</u>.
>
> However, what they both said was that the circumstances were unusual, that the area in which they were, <u>it would be unusual for someone who was Black to be in that area</u>. I can't say -- I can't say that myself. I don't know whether any counsel can say it, but these individuals said that that was unusual. And [Juror 4] expressed some initial concerns with it. <u>I don't think that that's even an expression of racism. So, your application is denied</u>.

[(Emphasis added).]

Approximately one hour later, the jury returned its verdict findings defendants guilty on most of the charges reflected in the verdict sheet.

V

Our Supreme Court has emphatically stated that "[a] defendant's right to be tried before an impartial jury is one of the most basic guarantees of a fair trial." State v. Loftin, 191 N.J. 172, 187 (2007); State v. Tindell, 417 N.J. Super. 530, 562-563 (App. Div. 2011). The Sixth Amendment of the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution guarantee criminal defendants "the right to . . . trial by an impartial jury." U.S. Const. amends VI, XIV; N.J. Const. art. I, ¶ 10. "That constitutional privilege includes the right to have the jury decide the case based solely on the evidence presented at trial, free from the taint of outside influences and extraneous matters." State v. R.D., 169 N.J. 551, 557 (2001).

The Court has stressed that jurors must be "as nearly impartial 'as the lot of humanity will admit.'" State v. Singletary, 80 N.J. 55, 62 (1979) (quoting State v. Jackson, 43 N.J. 148, 158 (1964), cert. denied sub nom. Ravenell v. New Jersey, 379 U.S. 982, 85 S. Ct. 690, 13 L. Ed. 2d 572 (1965)).

"A trial is poisoned at its inception if the jurors deciding the case cannot review the evidence dispassionately, through the light of reason." State v. Fortin, 178 N.J. 540, 575 (2004). For this reason, "all doubts about a juror's integrity or ability to be fair should be resolved in favor of removing the juror from the panel." Loftin, supra, 191 N.J. at 187.

A trial court has discretion to remove and replace a deliberating juror "because of [the juror's] illness or other inability to continue." R. 1:8-2(d)(1). Although seemingly vague and broad, the "inability to continue" standard must be narrowly construed and sparingly applied. State v. Jenkins, 182 N.J., 112, 124 (2004); State v. Hightower, 146 N.J. 239, 254 (1996). "Because juror substitution poses a clear potential for prejudicing the integrity of the jury's deliberative process, it should be invoked only as a last resort to avoid the deplorable waste of time, effort, money, and judicial resources inherent in a mistrial." Hightower, supra, 146 N.J. at 254 (citing State v. Lipsky, 164 N.J. Super. 39, 43 (App. Div. 1978)).

The reason behind a juror's inability to continue must be "personal and unrelated to the juror's interaction with the other jury members." State v. Valenzuela, 136 N.J. 458, 473 (1994).

> Thus a juror cannot be replaced by an
> alternate during deliberations merely

> because his position is at odds with the
> other jurors, or because a party perceives
> or receives information that the juror may
> be unfavorable to that party, or because the
> juror is unable to come to a decision by the
> time all the other jurors have reached
> theirs.
>
> [Pressler & Verniero, Current N.J. Court
> Rules, comment 4.3.2 on R. 1:8-2 (2014)
> (citations omitted).]

Courts have sanctioned the removal and replacement of deliberating jurors under the "inability to continue" standard in a variety of different circumstances. See, e.g., State v. Williams, 171 N.J. 151, 167 (2002) (juror complained of financial hardship); State v. Miller, 76 N.J. 392, 401-02 (1978) (juror was too nervous and could not render a fair verdict); State v. Trent, 157 N.J. Super. 231, 239-40 (App. Div. 1978) (juror under emotional distress because defendant reminded her of her son), rev'd on other grounds, 79 N.J. 251 (1979).

Although a deliberating juror's bias or prejudice falls within the "inability to continue" standard, the court, in opting for substitution rather than a mistrial, must ensure, by appropriate voir dire, that the other jurors were not tainted by the removed juror. Pressler & Verniero, Current N.J. Court Rules, comment 4.3.2 on R. 1:8-2 (2014). "When a jury is exposed to extraneous information after deliberations have begun, a mistral will almost always be required." Hightower,

supra, 146 N.J. at 255, 264 (court erred in removing a juror and not granting a mistrial where the juror informed the others that the victim had children).  See also State v. Adams, 320 N.J. Super. 360, 365-69 (App. Div.) (court erred in removing a juror and not granting a mistrial where the juror told the others that police often beat accused criminals), certif. denied, 161 N.J. 333 (1999).

The decision to grant a new trial based on jury taint resides in the discretion of the trial court.  But, if juror misconduct or bias has a tendency to influence the jury, a new trial should be granted without further inquiry as to its actual effect.  R.D., supra, 169 N.J. at 558 (citing Hightower, supra, 146 N.J. at 266-67; Panko v. Flintkote Co., 7 N.J. 55, 61 (1951)).  "The test is not whether the irregular matter actually influenced the result, but whether it had the capacity of doing so."  Panko, supra, 7 N.J. at 61.

"A new trial, however, is not necessary in every instance where it appears an individual juror has been exposed to outside influences."  R.D., supra, 169 N.J. at 559.  In deciding whether to grant a new trial, a trial court must consider:

> the gravity of the extraneous information in relation to the case, the demeanor and credibility of the juror or jurors who were exposed to the extraneous information, and the overall impact of the matter on the fairness of the proceedings.  The inquiry

about whether extraneous information had the capacity to influence the result of the jury requires an examination of whether there was at least an opportunity for the extraneous information to reach the remaining jurors when that extraneous information is knowledge unique to one juror who is excused mid-trial.

[Ibid.]

When "it becomes apparent that a juror may have been exposed to extraneous information, the trial court must act swiftly to overcome any potential bias and to expose factors impinging on the juror's impartiality." Id. at 557-58 (citing State v. Bey, 112 N.J. 45, 83-84 (1988)).

The court is obliged to interrogate the juror, in the presence of counsel, to determine if there is a taint; if so, the inquiry must expand to determine whether any other jurors have been tainted thereby. The trial court must then determine whether the trial may proceed after excusing the tainted juror or jurors, or whether a mistrial is necessary.

[Id. at 558 (citing Pressler, Current N.J. Court Rules, comment 2 on R. 1:16-1 (2000)).]

An appellate court reviews the trial court's jury-related decisions under the abuse of discretion standard. Id. at 559. This standard respects the trial court's unique perspective and the traditional deference we accord to trial courts in "exercising control over matters pertaining to the jury." Id. at 559-60. However, "an appellate court is not bound by a

42

determination when the 'particular circumstances present such a strong likelihood of prejudice that, as a matter of law,' the juror should have been removed." Loftin, supra, 191 N.J. at 192 (quoting State v. Biegenwald, 106 N.J. 13, 91 (1987)).

Here, the trial judge abused his discretion in failing to remove Juror 4. The record is replete with unambiguous evidence revealing Juror 4's racial bias. In her own words, she revealed how she immediately construed the presence of two African American men in her all white neighborhood as a menacing sign of possible retaliation by defendants, merely because they were also African American men. Even more disturbing, however, is the trial judge's reaction to Juror 4's revelations. The judge was not only oblivious to the juror's unmistakable racial bias, but he actually endorsed the juror's misguided apprehensions. The judge made his point of view on the subject of racial bias and prejudice clear when he denied Brown's defense counsel's motion to remove Jurors 4 and 5. "[W]e expect to some extent people have developed certain prejudices, some fixed ways of thinking."

The judge's impromptu, sua sponte "instructions" to the jury, made soon after the judge had finished interviewing the four jurors in his chambers, dispels any lingering doubt an

objective viewer could have about the judge's willingness to accept racial bias in a juror as an unavoidable reality of life.

> I want to make one comment, and I've already ruled on this, but in terms of creating the record, there's been an expression by [Juror 4] -- and also [Juror 5] <u>to a certain extent - - expressed some racial consciousness and potential racism by their comments</u>.
>
> However, what they both said was that the circumstances were unusual, that the area in which they were, <u>it would be unusual for someone who was Black to be in that area</u>. I can't say -- I can't say that myself. I don't know whether any counsel can say it, but these individuals said that that was unusual. And [Juror 4] expressed some initial concerns with it. <u>I don't think that that's even an expression of racism.</u>

> [(Emphasis added).]

These remarks coming from a sitting judge in a criminal trial are plainly inappropriate under any circumstances, but especially when they are uttered in a trial involving two African American defendants. A juror's expression of "racial consciousness and potential racism" must be immediately repudiated, and the juror must be removed from the jury. Thereafter, the trial judge must conduct a thorough, comprehensive, and probing investigation to determine what influence the juror's noxious sentiments had on other jurors.

Here, the judge's voir dire of Jurors 3, 5, and 12 was completely inadequate and fell far short of what was required

A-0211-12T1

under the circumstances. The judge did not ask any open ended questions. He began each of the interviews with these jurors with a variation of the statement, "Juror 4 expressed to you some concern about what she saw." The judge did not ask the jurors to recite what Juror 4 had told them. His "examination" of these jurors seemed designed to confirm his predisposition to find Juror 4's irrational, racist fears after seeing two African American men in her all white neighborhood as a completely justified and understandable reaction on her part. The judge accepted as sound and prudent Juror 5's advice to Juror 4 to report to a Sheriff's Officer that she had seen two African American men that morning in the park located outside her residence.

It is clear the judge found Juror 4's fears in this respect understandable. Indeed, the judge noted several times on the record his practice of speaking to jurors at the conclusion of trials and conduct his own version of a "customer service" interview. The judge highlighted that in the course of conducting these post-trial interviews, "juror safety and . . . [the] potential retaliation for verdicts" was a key and consistent concern expressed by most of the jurors he has interviewed. This statement reveals, with indisputable clarity, the judge's profound misapprehension of the significance of the

45

sentiments expressed by Juror 4 and 5. The judge considered the jurors' expressions of racial bias as legitimate fears to be addressed systemically by providing more security and ensuring the anonymity of the jurors. These views are utterly irreconcilable with one of the core principles of this State's judiciary, the delivery of equal justice under law to all of our citizens.

We have taken the time and effort to describe the record in these two consolidated appeals in great detail, because we wanted to reveal the profound, highly prejudicial errors that infected this trial, and by so doing, provide guidance to our colleagues at the trial level on how to address these highly contentious and profound issues when they arise. The essence of racial profiling is to associate criminality or wrongdoing as an aspect of a person's race or ethnic background. We have unequivocally condemned this specious and hateful practice when it was used by the law enforcement community in this State to target minority motorists as they travelled our highways. We must adopt the same policy of zero tolerance when a version of such an odious concept contaminates, to any degree, the jury's deliberative process. Racial bias is repugnant to any notion of fairness or impartiality; it is the antithesis of justice under the law.

Under these circumstances, we are compelled to reverse and vacate the convictions of both defendants Brown and Smith and remand the matter for retrial. Because this outcome is dispositive of this appeal, we do not address the remaining arguments raised by both defendants.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0211-12T1

_____

**ASHRAFI, J.A.D., concurring in the result.**

I concur in the court's judgment.  During deliberations, a juror expressed to other jurors and the judge an unjustified fear of retaliation by defendants because of an event unconnected to the trial and an invidious racial stereotype she harbored.  The impartiality of the jury was thus tainted. Defendants' motion for a mistrial should have been granted.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION