**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2349-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

BRITTANY L. BURNETT,

     Defendant-Appellant.

_____

        Submitted February 9, 2021 – Decided June 2, 2021

        Before Judges Gilson and Moynihan.

        On appeal from the Superior Court of New Jersey, Law
        Division, Bergen County, Indictment No. 18-12-1258.

        Hegge & Confusione, LLC, attorneys for appellant
        (Michael Confusione, of counsel and on the brief).

        Mark Musella, Bergen County Prosecutor, attorney for
        Respondent (Ian C. Kennedy, Assistant Prosecutor, of
        counsel and on the brief).

PER CURIAM

Tried to a jury, defendant Brittany L. Burnett appeals her conviction and concomitant sentence for third-degree aggravated assault on a law enforcement officer, N.J.S.A. 2C:12-1(b)(5)(a) (count one); disorderly persons resisting arrest, N.J.S.A. 2C:29-2(a)(1), as a lesser included charge of third-degree resisting arrest (count three); and second-degree eluding, N.J.S.A. 2C:29-2(b) (count four), arguing:

> POINT I
>
> THE TRIAL COURT ERRED IN ADMITTING TESTIMONY ABOUT DEFENDANT'S SUSPENDED OUT-OF-STATE DRIVER'S LICENSE[.]
>
> POINT II
>
> THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR ACQUITTAL OF THE SECOND[-]DEGREE ELUDING CHARGE AND THE THIRD[-]DEGREE AGGRAVATED ASSAULT ON A LAW ENFORCEMENT OFFICER CHARGE[.]
>
> POINT III
>
> PERMITTING THE PRIMARY STATE WITNESS, TROOPER DELGAIZO, TO TELL THE JURY ABOUT INJURIES HE CLAIMED TO HAVE SUSTAINED THAT WERE NEVER SUPPORTED BY EXPERT MEDICAL EVIDENCE VIOLATED THE RULES OF EVIDENCE PROHIBITING HEARSAY AND DEFENDANT'S RIGHT TO A FAIR TRIAL[.]

POINT IV

DEFENDANT'S RIGHT TO A FAIR AND IMPARTIAL JURY WAS VIOLATED BY THE TRIAL JUDGE'S FAILURE TO PROPERLY VOIR DIRE THE JURY POOL DURING JURY SELECTION, AND BECAUSE OF UNFAIR PREJUDICE TO DEFENDANT CAUSED BY THE JUDGE'S REPRIMAND OF DEFENDANT'S PARAMOUR IN FRONT OF JURY MEMBERS[.]

POINT V

DEFENDANT'S SENTENCE IS IMPROPER AND CLEARLY UNREASONABLE[.]

POINT VI

THE CUMULATIVE ERRORS WARRANT REVERSAL.

We reject defendant's arguments relating to trial error, but are constrained to remand for resentencing.

I

Turning first to defendant's argument that the trial court erred by denying her motion for judgment of acquittal on counts one and four,[1] we apply the same standard used by the trial court in our de novo review. State v. Dekowski, 218 N.J. 596, 608 (2014). We consider:

_____

[1] The trial court granted, in part, defendant's motion and dismissed count two charging third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(7).

whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.

[State v. Reyes, 50 N.J. 454, 459 (1967).]

From the trial record, we glean the evidence most favorable to the State. New Jersey State Trooper Michael Delgaizo, in full uniform, was posted approximately seventy-five yards from Route 120 when he heard a traffic-control worker, employed to direct vehicles exiting the MetLife Stadium parking lot onto Route 120 after a Taylor Swift concert, unsuccessfully ask defendant to move her vehicle that was partially blocking West Peripheral Road leading to Route 120. Defendant, who had driven concertgoers to the stadium and was scheduled to pick them up, ignored the traffic-control worker's requests made to defendant from a distance of two feet through her vehicle's open window.

Delgaizo saw that defendant's vehicle was illegally parked on the ramp leading to Route 120 blocking bus travel. Defendant ignored Delgaizo's thrice-given commands to move the vehicle, telling the person to whom she was ostensibly speaking on her cell phone that "a cop" was talking to her but she was not "fucking moving" until she knew where to go, prompting Delgaizo to order defendant to wait in place because he was going to issue her a summons.

4

Delgaizo took two or three steps toward his troop vehicle when he heard defendant's vehicle shift into drive. He "spun around," "slammed" the hood and yelled: "Stop. Put the car in park. Put the car in park." Defendant's vehicle rolled slowly forward and hit the trooper's knee. Delgaizo again yelled for defendant to "[s]top the car." When he reached his arm in the driver's window—which was "about three or four inches up"—to unlock the door, defendant "hit[] the gas, [and took] off" causing Delgaizo to lose his balance. The door was wedged under the trooper's armpit, and defendant's vehicle dragged Delgaizo on the ramp leading to Route 120 until he became dislodged and fell "end over end" multiple times.

The traffic-control worker witnessed the incident and, during his trial testimony, corroborated Delgaizo's version of events, as did a civilian witness who drove his girlfriend and a friend home from the concert.[2] So too, off-duty New Jersey State Trooper Brian Miller testified that as he was exiting the parking lot after attending the concert with his family, he saw: defendant's vehicle partially blocking West Peripheral Road; a trooper, who he would later

_____

[2] The civilian witness' girlfriend testified she saw defendant's vehicle jolt forward, Delgaizo slamming his hand on the vehicle's windshield, and Delgaizo's hand inside the vehicle until he fell as defendant drove away "moving pretty quickly."

5

learn was Delgaizo, speaking to the driver through the driver's open window; defendant suddenly pull away and bump Delgaizo; Delgaizo slam the vehicle's hood and yell "stop"; defendant's vehicle taking off "like a rocket ship" while Delgaizo's arm was inside the vehicle; and Delgaizo being dragged until he "tumbled across the ground."

Miller followed defendant's vehicle onto Route 120, then Route 3 where defendant drove erratically, recklessly changing lanes and cutting off vehicles. He discontinued pursuit when defendant drove onto Route 17. He obtained the vehicle's New York license plate and reported it and the make, model and direction of travel to dispatch.

Defendant's vehicle was later seen by Sergeant Michael Kenyon entering the MetLife Stadium lot from West Peripheral Road in a free-parking area also designated for Uber drivers to pick up and discharge passengers. Defendant resisted Kenyon's initial attempt to arrest her, as well as subsequent attempts by Kenyon and Detective Sergeant Clinton Pagano, both of whom were in full New Jersey State Police uniform. After she was finally handcuffed, while being transported, defendant slipped one arm free from the handcuffs; they were resecured.

A-2349-19

When reviewing a motion for judgment of acquittal under Rule 3:18-1, we are "not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the State." State v. Muniz, 150 N.J. Super. 436, 440 (App. Div. 1977). "If the evidence satisfies that standard, the motion must be denied." State v. Spivey, 179 N.J. 229, 236 (2004). Defendant's specific arguments ignore those principles.

She claims her counsel's cross-examination of Delgaizo showed defendant's vehicle was already moving when the trooper inserted his arm through the driver's window, and that the trooper's "overreact[ion] to a parking issue" caused his injuries; the incident was an accident. She also contends the incident occurred in MetLife Stadium's parking lot; thus, the State failed to prove that she eluded on a street or highway. Even if the facts claimed by defendant were established, those facts are not the facts most favorable to the State.

Under the assault statute, N.J.S.A. 2C:12-1(b)(5)(a), the State had to prove: (1) defendant purposely "attempt[ed] to cause or purposely, knowingly or recklessly cause[d] bodily injury" to Delgaizo; (2) Delgaizo was a law enforcement officer; and (3) defendant knew Delgaizo was a "law enforcement officer acting in the performance of his duties or while in uniform or exhibiting

7

evidence of his authority." See Model Jury Charges (Criminal), "Aggravated Assault - Upon Law Enforcement Officer (Attempting to Cause or Purposely, Knowingly or Recklessly Causing Bodily Injury) (N.J.S.A. 2C:12-1(b)(5)(a), (b), (c), (d), (e), (f), (g))" (rev. Dec. 3, 2001). The record evidence favorable to the State established those elements under the Reyes standard.

We note defendant did not include the eluding charge when arguing for judgment of acquittal before the trial court. Typically, we would decline to consider an issue not addressed to the trial court. State v. Robinson, 200 N.J. 1, 20 (2009). In its written decision denying defendant's motion, the trial court nevertheless analyzed the elements of eluding the State was required to prove: (1) defendant was operating a motor vehicle on a street or highway in this state; (2) Delgaizo was a police or law enforcement officer; (3) Delgaizo signaled defendant to bring the vehicle to a full stop; (4) defendant knew the officer had signaled her to bring the vehicle to a full stop; (5) defendant knew Delgaizo was a police or law enforcement officer; (6) defendant knowingly fled or attempted to elude the officer. N.J.S.A. 2C:29-2(b); see also Model Jury Charges (Criminal), "Eluding an Officer [Second and Third Degree] (N.J.S.A. 2C:29-2b)" (rev. Nov. 15, 2004).

8

Because defendant did not present the issue, the trial court did not explicitly find defendant operated the vehicle on a New Jersey street or highway. The record evidence most favorable to the State established defendant was on West Peripheral Road blocking traffic when Delgaizo approached the vehicle and issued commands to stay in place and, later, to stop her vehicle. Defendant fled on that road onto Route 120 after Delgaizo issued his commands through the open driver's window while standing proximate to defendant. Thus, under the <u>Reyes</u> standard, the trial court properly denied defendant's motion for judgment of acquittal.

II

We review defendant's arguments regarding the admission of both motive evidence under N.J.R.E. 404(b) and Delgaizo's testimony about his reading of the MRI of his injured knee, recognizing "the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion." <u>Est. of Hanges v. Metro. Prop. & Cas. Ins. Co.</u>, 202 N.J. 369, 383-84 (2010); <u>see also</u> <u>State v. Scott</u>, 229 N.J. 469, 479 (2017). We "apply a deferential standard in reviewing a trial court's evidentiary rulings and uphold its determinations 'absent . . . an abuse of discretion.'" <u>Scott</u>, 229 N.J. at 479 (quoting <u>State v. Perry</u>, 225 N.J. 222, 233 (2016)). An abuse of discretion may be shown if there is a "clear error

9

in judgment" or a ruling that would result in "a manifest denial of justice." Ibid. (quoting Perry, 225 N.J. at 233).

A

As the trial court instructed the jury, it admitted evidence that defendant's license was suspended on the day of the concert—July 20, 2018—for the jury's determination if the evidence established her "motive to flee and[/]or lack of mistake or an accident." The court strictly limited the jury's consideration of that evidence to the eluding charge, prohibiting it from considering the evidence in its deliberations on the aggravated assault or resisting arrest counts.

In a written decision, the trial court analyzed the evidence proffered by the State in support of its motion to admit evidence of defendant's license suspension under the four-prong Cofield test,[3] focusing on the third factor because defendant argued the State had not presented clear and convincing proof

---

[3] Under State v. Cofield, 127 N.J. 328, 338 (1992), the party proffering evidence of a prior bad act must prove:
> 1. The evidence of the other crime must be admissible as relevant to a material issue;
> 2. It must be similar in kind and reasonably close in time to the offense charged;
> 3. The evidence of the other crime must be clear and convincing; and
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.

10

defendant knew her license was suspended on July 20, 2018, the date of the eluding. The evidence the court found clear and convincing included a New York Department of Motor Vehicles abstract of defendant's driving record, suspension order, and notice of impending driver license suspension (the notice) and conviction with proof of mailing which the court aptly found

> establish[ed] that defendant's driving privileges were suspended on May 4, 2018[,] because she failed to pay a [d]riving [a]ssessment by virtue of [a] suspension order . . . and were also suspended on June 29, 2019[,] pursuant to [another] suspension order. [The notice] establish[ed] . . . defendant was informed on June 6, 2019[,] that her license would be suspended on or after June 28, 2018[,] because she failed to answer a speeding ticket and proof of mailing of [the notice] was also supplied. A [s]uspension [o]rder dated April 4, 2019, establishing an indefinite suspension on May 4, 2018[,] was also suppled.[4]

The trial court also considered the testimony of New Jersey State Trooper Edward Rufolo during the N.J.R.E. 404(b) motion hearing. In what the trial court described as a "pedigree interview," the court found "defendant stated that she knew that her driver's license was suspended" on July 20, 2018, "while he

---

[4] The dates quoted by the judge—June 29, 2019; June 6, 2019; and April 4, 2019—were incorrectly stated. The exhibits shown to the judge, and provided in the State's appendix, show the year was 2018, not 2019.

A-2349-19

acquired her pedigree information."[5]    The trial court determined "Rufolo's testimony about . . . defendant's admission, by itself, cause[d it] to find that the evidence is clear and convincing.   The [New York Department of] Motor Vehicle[s] documents merely bolster[ed] that conclusion."

Defendant argues her admission to Rufolo should not have been considered because the trial court "had already determined that defendant's Miranda[6] rights were violated and that her statements could not be introduced into evidence against her at trial."  She also claims her admission to Rufolo was not "pedigree information," but responded to Rufolo's inquiry when he "just asked her how's her license," a question not set forth or related to information directly necessary to complete the report he was writing.

---

[5] As we held in State v. M.L., 253 N.J. Super. 13, 21 (App. Div. 1991), "booking procedures and the routine questions associated therewith"—commonly known as pedigree questions that result in "pedigree information" provided by a suspect—"are ministerial in nature and beyond the right to remain silent." "Even unexpected incriminating statements made by in-custody defendants in response to non-investigative questions by the police without prior Miranda warnings are admissible."  Ibid.; see also United States ex rel. Hines v. LaVallee, 521 F.2d 1109, 1112-13 (2d Cir. 1975).

[6] Miranda v. Arizona, 384 U.S. 436 (1966).

A-2349-19

It does not appear from the record provided that defendant challenged defendant's statement to Rufolo in her suppression motion.[7]   Indeed, the trial court noted in its written 404(b) decision:

> This court realizes that the State's motion to admit <u>other</u> statements made by . . . defendant was denied based upon the failure to proper[l]y advise . . . defendant of her <u>Miranda</u> rights.  The information addressed in this motion is pedigree information.  <u>Miranda</u> does not apply. . . . Further discussion of this issue is not merited as the defense has not raised this issue.
>
> [(Emphasis supplied).]

We thus decline to address defendant's present argument that her admission went beyond "pedigree information," should have been suppressed and was inadmissible to establish clear and convincing proof of her motive to elude. <u>State v. Robinson</u>, 200 N.J. 1, 15 (2009).

Furthermore, the trial court's finding that there was clear and convincing evidence, even untethered from the "pedigree information," provided clear and convincing evidence defendant's license was suspended and she knew it was suspended.  <u>See</u> <u>State v. Calleia</u>, 206 N.J. 274, 296 (2011) (holding "in order to be admissible as motive evidence, the State must directly or circumstantially

---

[7]   Neither the transcripts of the <u>Miranda</u> hearing, nor the court's opinion was included in the record.

show that the accused probably knew of the facts that are alleged to have given rise to the motive"). Contrary to defendant's contention in her merits brief that the July 31, 2018 notice was dated after the incident, other notices and the dates of suspension or proposed suspension set forth therein pre-dated July 20, 2018, including the notice to which was attached a mailing record establishing it was received and scanned at the United States Postal Service's (USPS) facility serving defendant's home-address zip code on June 9, 2018, and that "[t]he USPS confirmed this information with the [New York] Department [of Motor Vehicles]" on that date. There is no evidence defendant complied with the conditions to prevent any proposed suspension, or that she took action to clear any actual suspension. And, as noted in defendant's merits brief, Rufolo testified that, after defendant made her admission, additional "look-ups" revealed her license was suspended.

We also reject defendant's argument that inconsistencies in Rufolo's testimony about the unrecorded pedigree procedure rendered it "not credible." The trial court found the trooper's testimony "honest and very credible," a finding to which we accord deference. See State v. Locurto, 157 N.J. 463, 474 (1999) ("Appellate courts should defer to trial courts' credibility findings that are often influenced by matters such as observations of the character and

demeanor of witnesses and common human experience that are not transmitted by the record.").

The trial court addressed defendant's present argument that the proffered evidence did not meet Cofield's fourth prong because it was unfairly prejudicial, holding:

> The probative value is great. It may establish motive or may answer the question of why . . . defendant elected to flee. Its prejudice is slight. Many motorists who commit violations do not flee. They stay and are served with appropriate summonses. The evidence does not conclusively answer the question of why and the facts afford the defense opportunity to raise doubts, perhaps by cross-examination. For example, if the State's evidence is believed, the defendant did not move her car when Trooper Delgaizo first asked her merely to move the vehicle she was driving.

The Calleia Court recognized "the special role of motive evidence and its unique capacity to provide a jury with an overarching narrative, permitting inferences for why a defendant might have engaged in the alleged criminal conduct." Id. at 293. Because "motive must [often] be pieced together; potential motivating factors must be gleaned from evidence that does not itself bespeak criminal intent but merely explains what events might have led the accused to commit a criminal act," "motive is treated somewhat differently than other types of evidence," and "a 'wider range of evidence' is permitted to prove motive, so

15

long as it remains a material issue in a case." Id. at 293-94 (quoting State v. Covell, 157 N.J. 554, 565 (1999)). "'Any evidence which has a legitimate bearing on the question of motive is as a general rule admissible' so long as it 'at least to a slight degree tend[s] to establish the existence of the motive relied on.'" Id. at 293 (alteration in original) (quoting 41 C.J.S. Homicide § 325 (2006)). "Time and again, courts have admitted motive evidence even when it did no more than raise an inference of why a defendant may have engaged in criminal conduct, and even in the face of a certain degree of potential prejudice stemming from the evidence." Id. at 294. When evidence provides proof of motive, "a strong showing of prejudice is necessary to exclude [such] evidence under the balancing test of N.J.R.E. 403." Ibid.

The trial court was well within its discretion in finding the probative value of the evidence was not outweighed by its apparent prejudice, especially considering that the evidence related to non-criminal conduct, see generally State v. DiFrisco, 137 N.J. 434, 497 (1994) ("Considering that defendant confessed to the execution-style killing of [the victim], [introduction of evidence] that he stole a car, committed a few traffic violations, and yelled at his mother had very little tendency to divert the jurors' attention from their

16

duties."), and the trial court's limiting instruction narrowly focused the use of the evidence.

We discern no abuse of discretion in the trial court's determination that the State established the admissibility of the evidence relating to defendant's license suspension under the Cofield test. Even if the admission of the evidence was in error—which we neither suggest nor determine—considering the numerous eyewitnesses' testimony regarding defendant's eluding, the error was not "of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2; see, e.g., State v. Jordan, 147 N.J. 409, 421-22 (1997); State v. Hunt, 115 N.J. 330, 363 (1989). As described by the witnesses, defendant's actions, even absent motive evidence, clearly established the elements of eluding.

B

Defendant next asserts the admission of Delgaizo's testimony about his knee injury "was impermissible expert opinion hearsay evidence." Specifically, when asked on direct examination what he saw "on the MRI relating to [the] tendons in [his] knee," Delgaizo replied he "[s]aw abnormalities. There was a section of my knee that you could see that wasn't completed (sic) connected. There was like a – like a minor tear in it. I mean you could see it."

17

We agree with defendant; the testimony should not have been allowed, especially over defendant's objection. The assistant prosecutor failed to call the doctor who actually read the MRI. His elicitation from Delgaizo of what was obviously a medical interpretation of that diagnostic study was an indolent attempt to introduce hearsay expert medical testimony. In Brun v. Cardoso, 390 N.J. Super. 409, 421 (App. Div. 2006), we held, over an objection, an "interpretation of an MRI may be made only by a physician qualified to read such films, and that the MRI report could not be bootstrapped into evidence through [a chiropractor's] testimony. Our conclusion is not dependent on [the doctor's] status as a chiropractor but on the complexity of MRI interpretations." And, the admission of the victim's testimony deprived defendant of a fair opportunity to cross-examine the doctor who actually read the MRI. See id. at 422.

Delgaizo was not qualified as an expert in radiology or any other medical field. Indeed, the assistant prosecutor did not establish any foundation to show Delgaizo had first-hand knowledge of what he was viewing on the MRI. But again, the error was not "of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2; see, e.g., Jordan, 147 N.J. at 421-22; Hunt, 115 N.J. at 363.

The severity of the injury depicted in the MRI was necessary to prove the significant-bodily-injury element of the aggravated assault count,[8] but that count was dismissed. To prove the remaining aggravated assault count, the State was required to prove that defendant purposely, knowingly or recklessly caused or purposely attempted to cause only "bodily injury," N.J.S.A. 2C:12-1(b)(5)(a); 2C:12-1(a)(1); that is "physical pain, illness or any impairment of physical condition." N.J.S.A. 2C:11-1(a).

Among the other injuries to which Delgaizo testified and were shown in photographic evidence, Delgaizo suffered abrasions to his knees. As defendant conceded in summation, "[w]e know his knees got bloody." Delgaizo also testified about the long rehabilitative process he endured, including physical therapy. Thus, in light of the overwhelming, uncontradicted evidence that Delgaizo suffered bodily injury, the admission of his hearsay testimony did not result in an unjust conviction.

---

[8] Under N.J.S.A. 2C:12-1(b)(7), a person who "[a]ttempts to cause significant bodily injury to another or causes significant bodily injury purposely or knowingly or, under circumstances manifesting extreme indifference to the value of human life recklessly causes such significant bodily injury" is guilty of aggravated assault. "'Significant bodily injury' means bodily injury which creates a temporary loss of the function of any bodily member or organ or temporary loss of any one of the five senses." N.J.S.A. 2C:11-1(d).

# III

Although, as defendant's trial counsel advised the trial court, defendant does not contend "there was bias on the part of the troopers[,]" defendant argues she was deprived of a fair trial because the trial court did not pose questions to the jury venire regarding bias engendered by "the fact that she is an African-American lesbian who has adopted a manner of clothing that is more masculine than feminine." We fully endorse questioning jurors regarding potential bias of any kind. "[L]itigants are entitled to an unbiased jury and . . . a fair jury selection process." Pellicer ex. rel. Pellicer v. St. Barnabas Hosp., 200 N.J. 22, 40 (2009). Indeed,

> [t]he purpose of jury selection is to obtain a jury that can decide the case without bias against any of the involved parties, that will evaluate the evidence with an open mind, and that will apply the law as instructed by the judge. Voir dire practices must be geared to eliciting meaningful information from prospective jurors so those with a real potential for bias can be excused.
>
> [State v. Bianco, 391 N.J. Super. 509, 517 (App. Div. 2007) (quoting Administrative Directive #21-06, "Approved Jury Selection Standards" (Dec. 11, 2006)).]

But, considering the trial court's conduct of the voir dire, there is no merit to defendant's argument, chiefly because the court did ask those questions.

A-2349-19

Contrary to defendant's merits brief argument that her "counsel asked for the voir dire inquiry right away," the record reflects, despite a June 3, 2019 pretrial order that required counsel to submit proposed voir dire questions to the court by September 2, 2019, defendant first requested the sexual-orientation-bias question to the court on September 10, 2019, after the court had read the standard and additional questions to the venire. The trial court declined the request as tardy and irrelevant.

The next trial day, the court proposed an alternate sexual-orientation-bias question, but defendant's counsel rejected it as inadequate; the court, again, declined to ask the question proposed by defendant. On September 17, 2019, voir dire continued, and defendant renewed her request for her question to be posed, added an additional proposed racial-bias question because Delgaizo was Caucasian, and, claiming there was "no way to correct the deficiency" caused because those questions were not asked "without further tainting the jury pool against" her, moved for a mistrial and requested that jury selection begin anew.

During the September 18, 2019 proceedings, the trial court denied defendant's motion for a mistrial, but agreed to add a racial-bias question and a sexual-orientation-bias question. The court crafted two questions it would ask

21

to all potential jurors, including those seated in the jury box. Defendant did not object to the questions and neither party objected to the voir dire procedure.[9]

The court asked the question of the seated jurors and incorporated them when questioning jurors subsequently called to the box. Both parties exercised peremptory challenges; defendant had fifteen remaining peremptory challenges and the State had eight when the court began asking the additional questions. Defendant did not exhaust her peremptory challenges.

We deem meritless defendant's claim that she was deprived a fair trial because the two added questions were not asked "from the beginning" of juror voir dire, and by the time the questions were asked, "it was too late to correct the prejudice." We first note defendant does not specify any prejudice she suffered. And we perceive none in light of the fact that all jurors were asked about both forms of bias.

We typically leave the selection and management of the jury to the sound discretion of the trial court. State v. Brown, 442 N.J. Super. 154, 182 (App. Div. 2015). "This standard respects the trial court's unique perspective and the

_____

[9] The State agreed to the timing of the questions and, with defense counsel, helped draft the racial-bias question, but objected because the questions, particularly the sexual-orientation question, would plant a thought in the jurors' minds that had no relation to any testimony. The assistant prosecutor stated his preference for a more general minority-bias question.

traditional deference we accord to [it] in 'exercising control over matters pertaining to the jury.'" Ibid. (quoting State v. R.D., 169 N.J. 551, 559-60 (2001)).

Voir dire determinations "are traditionally within the broad discretionary powers vested in the trial court and 'its exercise of discretion will ordinarily not be disturbed on appeal.'" State v. Williams, 113 N.J. 393, 410 (1988) (quoting State v. Jackson, 43 N.J. 148, 160 (1964)); see also State v. Murray, 240 N.J. Super. 378, 392 (App. Div. 1990). In the selection of a jury, "trial courts must be allotted reasonable latitude when conducting voir dire and, therefore, [our] examination . . . focus[es] only on determining whether 'the overall scope and quality of the voir dire was sufficiently thorough and probing to assure the selection of an impartial jury.'" State v. Winder, 200 N.J. 231, 252 (2009) (quoting State v. Biegenwald, 106 N.J. 13, 29 (1987)).

Although we have recognized a trial court is "not obliged to ask any particular question or indulge the defendant's requests absolutely," State v. Lumumba, 253 N.J. Super. 375, 394 (App. Div. 1992), the better practice here would have been to ask about the two areas of bias from the start. That the questions weren't initially posed, however, was due in large part by defendant's failure to timely request them. Notwithstanding the delay, "the overall scope

23

and quality of the voir dire," during which the remaining jurors were asked about potential bias based on race and sexual orientation, adequately explored those areas. Biegenwald, 106 N.J. at 29; see also Winder, 200 N.J. at 252. Defendant points to no evidence that any of the final jurors were ineffectively questioned or were in any way partial. Nor does defendant contend she was precluded from exercising peremptory challenges. See State v. Dishon, 297 N.J. Super. 254, 266, 270 (App. Div. 1997) (decrying the trial court's practice of asking defendant's supplemental questions only after defendant had exhausted all peremptory challenges).

We also reject defendant's claim that the court's denial of a mistrial was error. A mistrial should only be granted "to prevent an obvious failure of justice." State v. Harvey, 151 N.J. 117, 205 (1997). Whether a trial event justifies a mistrial is a decision "entrusted to the sound discretion of the trial court." Ibid. We "will not disturb a trial court's ruling on a motion for a mistrial, absent an abuse of discretion that results in a manifest injustice." Ibid.; see also State v. Jackson, 211 N.J. 394, 407 (2012). If there is "an appropriate alternative course of action," a mistrial is not a proper exercise of discretion. State v. Allah, 170 N.J. 269, 281 (2002).

24

The procedure ultimately employed by the trial court was an appropriate alternative to a mistrial. We see no abuse of discretion or failure of justice in the trial court's decision to continue voir dire and ask all jurors the additional questions to elicit any potential bias.

We determine defendant's remaining argument, that the trial court erred by failing to excuse the jury panel because defendant's girlfriend became emotionally upset as she left the courtroom after the court addressed its perception that she may have been recording jury selection, to be without sufficient merit to warrant discussion. R. 2:11-3(e)(2). Despite defendant's counsel's claim to the trial judge that "[t]here [was] no way these jurors did not potentially see . . . there was something [of magnitude] going on," defendant does not specify any juror who saw the distraught girlfriend and was, or may have been, thereby tainted. In fact, when the court asked members of the venire about the incident, only one juror responded affirmatively, disclosing she had heard "the young lady in the back [of the courtroom] . . . yelling about coffee and she seemed to be crying." The juror said the incident would not affect her ability to be fair and impartial; the court, nevertheless excused her for cause on the parties' joint application. The court's course of action was by no means an abuse of discretion. See Harvey, 151 N.J. at 205.

IV

To the extent not addressed, we determine defendant's remaining arguments, including that the cumulative trial errors warrant reversal and a new trial, to be without sufficient merit to warrant discussion.  R. 2:11-3(e)(2). Defendant did not receive a perfect trial, but received the fair one to which she was entitled.  See State v. Weaver, 219 N.J. 131, 160 (2014); State v. Loftin, 287 N.J. Super. 76, 110-11 (App. Div. 1996).

V

Defendant challenges the sentences imposed: five years in State prison for second-degree eluding; 364 days in the county jail for third-degree aggravated assault on a law enforcement officer; and four months in the county jail for disorderly persons resisting arrest.  The first two sentences ran concurrently; the four-month disorderly persons sentence ran consecutive to the five-year term. Defendant contends the trial court erred by (1) failing to sentence her one-degree lower pursuant to N.J.S.A. 2C:44-1(f)(2) on the eluding charge and (2) imposing a consecutive sentence on the disorderly persons conviction.

We "review sentencing determinations in accordance with a deferential standard."  State v. Fuentes, 217 N.J. 57, 70 (2014).  In our review, we "must

26

not substitute [our] judgment for that of the sentencing court." Ibid. We will affirm a sentence unless:

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Ibid. (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

We address defendant's first argument, recognizing the trial court could have imposed a sentence in the third-degree range on the second-degree eluding count if it was "clearly convinced that the mitigating factors substantially outweigh[ed] the aggravating factors and where the interest of justice demand[ed]." N.J.S.A. 2C:44-1(f)(2).

Defendant contends the trial court failed to find mitigating factors one, N.J.S.A. 2C:44-1(b)(1) ("defendant's conduct neither caused nor threatened serious harm"); two, N.J.S.A. 2C:44-1(b)(2) (whether defendant "contemplate[d] that [her] conduct would cause or threaten serious harm"); six, N.J.S.A. 2C:44-1(b)(6) (defendant "will compensate the victim" or "will participate in a program of community service"); eight, N.J.S.A. 2C:44-1(b)(8) (defendant's conduct was the result of circumstances unlikely to recur); and nine,

27

N.J.S.A. 2C:44-1(b)(9) (defendant's character indicates she is unlikely to reoffend); and failed to give proper weight to mitigating factors seven, N.J.S.A. 2C:44-1(b)(7) (defendant's lack of prior criminal record); and, if found, eleven, N.J.S.A. 2C:44-1(b)(11) (imprisonment would cause great hardship for defendant or her dependents). She contends if the court had properly considered those factors, defendant would have met the statutory requirements for a sentence one-degree lower. We disagree.

The trial court carefully considered each mitigating factor proposed by defendant and, contrary to defendant's argument, did find mitigating factor six. The court declined to find mitigating factor one inasmuch as Delgaizo suffered "injuries to both knees," had surgery and spinal injections and "missed a significant amount of time from work in order to start to recover from his injuries." It rejected mitigating factor two because evidence showed Delgaizo was dragged backwards by defendant's moving vehicle and was so close to defendant that "[s]he had to realize . . . Delgaizo would be injured when she drove off, while [the trooper] hung onto her car door." Defendant's offer to perform community service led the court to give mitigating factor six[10] "very

_____

[10] In analyzing whether defendant compensated or would compensate the trooper or would participate in a community service program, the trial court

28

light weight," finding she had not compensated Delgaizo and offered no explanation how—without a job or assets—she would compensate him for his injuries. The trial court accorded mitigating factor seven "light weight," discounting defendant's lack of criminal history due to her young age.

The trial court considered defendant's actions throughout the entire criminal episode on July 20, 2018, and related its reasoning for finding aggravating factor three, N.J.S.A. 2C:44-1(a)(3) (the risk that defendant will reoffend), concluding defendant "is of the disposition, for whatever reason, to believe that nobody is going to tell her what to do." The court deduced that attitude was not one "that bodes well when one interacts with the law," and rejected mitigating factor eight. As we noted in State v. Towey, 244 N.J. Super. 582, 593 (App. Div. 1990), aggravating factor three and mitigating factor eight are related. The trial court's supported finding of aggravating factor three militates against mitigating factor eight. Cf. State v. O'Donnell, 117 N.J. 210, 216 (1989) (finding the defendant's "almost boastful" attitude towards his offense evidenced a belief that defendant could "take the law into his own hands," thus supporting the trial court's finding that the defendant was likely to

---

referred to the factor as "[t]hree." It was the third mitigating factor it considered, but the court was obviously analyzing mitigating factor six.

commit future offenses). The trial court cited the same reason for rejecting mitigating factor nine.

Although defendant argues in her merits brief mitigating factor eleven "is noted in the [j]udgment of [c]onviction but [was] not found at sentencing," the trial court did find the factor. In her merits brief, defendant alternatively contends the factor should have been given more weight because, as an "openly gay woman who suffered sexual assault by a family friend" as a young girl and discrimination because of her sexual orientation, she developed a valuable bond with her "close-knit, loving, and deeply[-]religious family" who, with her fiancé, "will suffer significantly while defendant serves her prison sentence." The trial court considered those same facts, found defendant would face hardship in prison and accorded light weight to mitigating factor eleven because he doubted defendant placed her professed concern for her family and fiancée before the self-concern he found she had exhibited.

The trial court also found aggravating factors three, N.J.S.A. 2C:44-1(a)(3) (the risk that defendant will reoffend), and nine, N.J.S.A. 2C:44-1(a)(9) (the need for deterrence), concluding they significantly outweighed the mitigating factors.

In reviewing the trial court's sentencing decision, we do not "substitute [our] judgment for that of the trial court." O'Donnell, 117 N.J. at 215. We are "bound to affirm a sentence . . . as long as the trial court properly identifies and balances aggravating and mitigating factors that are supported by competent credible evidence in the record." Ibid. The trial court did just that.

Considering the trial court's well-reasoned findings, a downgrade under N.J.S.A. 2C:44-1(f)(2) was not warranted. Defendant did not meet the high standard required for a downgrade. State v. Megargel, 143 N.J. 484, 500 (1996). Not only was the court not "clearly convinced that the mitigating factors substantially outweigh[ed] the aggravating factors," defendant's reasons are not sufficiently compelling to establish that "the interest of justice demands" a downgrade. N.J.S.A. 2C:44-1(f)(2); see also Megargel, 143 N.J. at 501-02, 504-05.

Defendant also challenges the trial court's decision to impose consecutive sentences. She argues the eluding and resisting arrest offenses "were related to each other and occurred close in time" and "was one continuous event or single period of aberrant behavior rather than truly separate events causing harm to separate victims."

31

Trial courts "have discretion to decide if sentences should run concurrently or consecutively." State v. Miller, 205 N.J. 109, 128 (2011); see also N.J.S.A. 2C:44-5(a). "When a sentencing court properly evaluates the [remaining[11]] Yarbough factors[12] in light of the record, the court's decision will not normally be disturbed on appeal." Miller, 205 N.J. at 129.

---

[11] The Legislature disapproved a sixth factor that set an outer limit on the overall cumulation of consecutive sentences. L. 1993, c. 233, § 1.

[12] In State v. Yarbough, 100 N.J. 627, 643-44 (1985), superseded by statute in part, N.J.S.A. 2C:44-5(a), as recognized in State v. Cuff, 239 N.J. 321 (2019), our Supreme Court established factors that a sentencing court must consider when deciding whether to impose consecutive sentences:

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
>
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
>
> > (a) the crimes and their objectives were predominantly independent of each other;
> >
> > (b) the crimes involved separate acts of violence or threats of violence;

The trial court assessed those factors and recognized the eluding and aggravated assault crimes stemmed from a single act involving one victim, Delgaizo, and ran those sentences concurrent to each other. The court, however,

---

(c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;

(d) any of the crimes involved multiple victims;

(e) the convictions for which the sentences are to be imposed are numerous

(4) there should be no double counting of aggravating factors;

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense[.]

See also State v. Torres, __ N.J. __, __ (2021) (slip op at 32, 34) (instructing trial courts "performing the Yarbough fairness assessment must be mindful that aggravating and mitigating factors and Yarbough factors, as well as the stated purposes of sentencing in N.J.S.A. 2C:1-2(b), in their totality, inform the sentence's fairness" which "cannot be divorced from consideration of the person on whom it is imposed. . . . Assessing the overall fairness of a sentence requires a real-time assessment of the consequences of the aggregate sentences imposed.").

33

discerned the resisting arrest charge occurred after defendant returned to MetLife Stadium's parking lot one hour after she eluded and assaulted Delgaizo, and she resisted multiple times against different troopers. We find no reason to disturb the court's exercise of its broad discretion in imposing a single consecutive four-month sentence for the resisting arrest offense. In addition to the factors cited by the trial court, we note the resisting arrest offense had a different objective—preventing her arrest—than did the eluding and aggravated assault—avoiding a ticket after blocking traffic. Defendant was violent in each of the encounters, even after she had time to cool off after committing the crimes against Delgaizo.

We are, however, compelled to remand this matter for resentencing. The trial court's 364-day custodial sentence for third-degree aggravated assault on a law enforcement officer contravened N.J.S.A. 2C:43-6(a)(3), which mandates, under these circumstances, a three- to five-year sentence. And, in that defendant received a State-prison sentence for eluding, the court should not have sentenced her to the county jail on the other offenses. See N.J.S.A. 2C:43-10(a), (d).

On remand, the sentencing court should provide "an explanation for the overall fairness of [the newly-imposed, State prison] sentence . . . to 'foster[] consistency in . . . sentencing in that arbitrary or irrational sentencing can be

curtailed and, if necessary, corrected through appellate review.'" <u>Torres</u>, __ N.J. at __ (slip op. at 33) (quoting <u>State v. Pierce</u>, 188 N.J. 155, 166-67 (2006)). We also note the judgment of conviction should be amended to reflect the aggravating and mitigating factors found by the court during the sentencing proceeding: mitigating factors six and seven.

Defendant's conviction is affirmed; remanded for resentencing. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2349-19