**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0527-20

STATE OF NEW JERSEY,

    Plaintiff–Respondent,

v.

ANTHONY BARKSDALE, a/k/a
ANTHONY BARKSDALE, JR.,

    Defendant–Appellant.

_____

Argued September 24, 2024 – Decided October 24, 2024

Before Judges Smith, Chase, and Vanek.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 19-12-1952.

Scott Michael Welfel, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Scott Michael Welfel, of counsel and on the briefs).

Shiraz I. Deen, Assistant Prosecutor, argued the cause for respondent (Bradley D. Billhimer, Ocean County Prosecutor, attorney; Samuel J. Marzarella, Chief Appellate Attorney, of counsel; Shiraz I. Deen, on the brief).

PER CURIAM

Defendant Anthony Barksdale, Jr. appeals from an August 27, 2020 judgment of conviction ordering him to serve a life sentence without parole for murder, N.J.S.A. 2C:11-3b(4)(d). We affirm.

I.

On March 5, 2018, between 8:40 and 9:00 p.m., a resident of the Hampton Gardens apartment complex in Toms River was awakened by the sound of a "small crack." He exited the apartment twenty minutes later and, on his porch, discovered a man lying in a pool of blood. He immediately called 9-1-1.

Officers from the Toms River Police Department were dispatched and observed a deceased man, later identified as Steven Stallworth. An autopsy revealed Stallworth died of a gunshot wound to the back of the head at "near-contact range." Evidence recovered from the scene included two cellphones near the victim, another in his pocket, a 9-mm shell casing, and two samples of saliva located four to five feet from the victim.

Detective Duncan Macrae responded to the scene. At approximately 10:00 p.m., Macrae was informed that Sevon Hill was observed walking towards Hampton Gardens. Macrae was familiar with Hill as a mid-to-high level narcotics dealer and previously arrested him for possession of a handgun. The

detective knew Hill resided in an apartment near where Stallworth was found. Macrae and another detective contacted Hill and took him to the police station for questioning, where he waived his Miranda[1] rights and sat for an interview.

Hill stated he was currently staying at the Ramada Inn in Toms River because of issues with his partner, Dayna Daly. Hill stated he went to Hampton Gardens to reassure Daly, who had heard about the shooting. Hill executed a consent to search form for his hotel room, his vehicle, and his iPhone. A later search of Hill's phone revealed it had been used earlier that day for internet research on how to operate a 9-mm Ruger handgun.

Slightly before midnight, police went to the Ramada Inn to search Hill's room. Detective John Murphy of the Ocean County Prosecutor's Office testified he and two other officers knocked on the hotel room door and heard voices inside. However, it took defendant and another individual in the room, about ten minutes to open the door. Murphy informed defendant of Hill's consent to search the hotel room. During the search, the officers located a safe which Hill had previously given them the code to. Inside the safe, the officers discovered various quantities of different types of controlled dangerous substances ("CDS"), which Hill later admitted belonged to him. Murphy asked defendant

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

if he would be willing to come down to the station and talk with them, to which he agreed.

Murphy testified defendant was transported to headquarters in a marked police vehicle because he did not have a car. Murphy further stated at that time defendant was not a suspect and, in fact, the officers had no reason to believe he was involved in the homicide at all. Upon arrival at the station, the detectives opened the interview by thanking defendant for coming down to the station, explaining they knew he wasn't expecting them, and told him they were "gonna get you out of here as fast we can." The interview lasted around thirteen minutes, during which defendant was primarily asked about Hill's whereabouts that night. Defendant said he believed Hill had left the hotel sometime between 10:00 and 10:30 p.m. to see his girlfriend. After the interview, defendant left the station by getting a ride from his father.

Subsequently, the detectives were able to obtain the surveillance footage from the Ramada Inn. The footage revealed defendant and Hill leaving the hotel at 7:20 p.m. on the night of the murder, arriving back at around 9:40 p.m., and Hill leaving a second time by himself afterwards. The investigation also revealed that after 7:00 p.m., on the night of the homicide, another resident of

4

Hilton Garden recognized Hill approaching with another African American man who was around Hill's age and whom she had seen with Hill on a prior occasion.

On March 12, 2018, Hill came to the Toms River Police Department to pick up the keys to his hotel room. Defendant and his father dropped Hill off at the police station, and the detectives followed the pair and conducted a motor vehicle stop to bring them back to the station. Defendant executed a <u>Miranda</u> waiver form and agreed to speak to the detectives for a second time. Hill simultaneously provided a statement to police from a separate room.

In his second recorded statement, defendant insisted he had stayed at the Ramada Inn during the entire period of the murder, but that Hill had left without him. When repeatedly challenged with the surveillance footage demonstrating he left the hotel, defendant maintained his denial and stated he could not remember leaving with Hill. He also denied any involvement with the murder. Although at one point defendant told the officers he didn't want to talk anymore, they continued to question him. At the conclusion of their statements, both men were arrested and charged with the murder of Stallworth.

The next day, Hill expressed a desire to speak with detectives. He provided another statement claiming defendant was responsible for shooting and killing Stallworth. Hill told the detectives he had provided defendant with the

9-mm murder weapon and after the shooting they left it in a Grand Marquis parked near the Silver Ridge Apartments in Toms River. Upon execution of a search warrant for the Grand Marquis, officers recovered several items from its trunk, including one thousand packets of heroin, a loaded Ruger 9-mm handgun in a Nike hat, and another weapon and magazine. There were thirteen shells inside the Ruger 9-mm magazine which possessed the same stamp as the shell casing recovered near Stallworth's body. A firearm and toolmark examiner opined the shell casing and the bullet recovered from Stallworth's skull were fired from the Ruger 9-mm recovered from the Grand Marquis. A DNA analysis also revealed defendant's DNA was in the saliva found near Stallworth's body.

Subsequently, a grand jury issued a twenty-six-count indictment against Hill, Anthony Barksdale, Sr., and defendant. Hill then pleaded guilty to first-degree aggravated manslaughter along with several weapons and CDS offenses. Hill's plea was contingent upon his truthful testimony against defendant at trial. Before his plea, Hill gave a fourth taped statement where he explained Stallworth's death was not the result of a robbery, but a murder-for-hire arrangement.

After the plea, a grand jury issued a superseding indictment against defendant only. This five-count indictment charged defendant with: first-

degree murder, N.J.S.A. 2C:11-3(a); first-degree conspiracy to commit murder, N.J.S.A. 2C:11-3(a) and (b); N.J.S.A. 2C:5-2; second-degree unlawful possession of a weapon, N.J.S.A. 2C:39(5)(b)(1); second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a); and second-degree possession of a weapon by a convicted person, N.J.S.A. 2C:39-7(b). The State dismissed the previous indictment.

Jury selection began in March 2020. During jury selection, Juror Number 12 disclosed various potential connections to this case. First, during voir dire, she disclosed that her husband used to train in karate with the Toms River Police Chief. Juror 12 stated she had met him a few times, but they did not have a relationship, and it would not impact her impartiality.

Then—after jury selection was completed but prior to the court's swearing-in the jury—she informed court staff she "may have come into possession of information . . . which may prevent her from continuing." The next day, the court held a sidebar with the juror and counsel:

> JUROR NO. 12: . . . Yesterday on my way home I had a conversation with my husband. He found out, a friend of ours told him that I was potentially serving on this trial. Apparently one of the jurors that was excused early on is a friend of that, friend of ours, gave him all the information about the trial and then described me. And it was somewhat of a conversation like, oh, don't you know people in the religious community, someone

who said that they used to pastor in the Toms River area, is someone that I was serving on a jury trial with. Do you know who they are? So that friend recognized me, spoke to my husband.

And then the second part of that was my husband knows about this case because of his employment at the church in Freehold. Apparently, some of the family members, extended family members of the victim attend that church in Freehold.

THE COURT: Did your husband tell you anything?

JUROR NO. 12: I told him to stop giving me any information, I didn't want any information. I wanted to preserve whatever integrity that was—

THE COURT: How much did he tell you, just that the family members attend the church?

JUROR NO. 12: He was concerned now that he knew there was some kind of connection there, maybe an issue later down the line because apparently I know the people and they would be able to recognize me and vice-versa in the event they attended.

The concern is I don't know if there's going to be an issue later on after the trial, but he didn't tell who they were, didn't want to know.

The court then asked questions to clarify Juror Number 12's connection with the victim's family. Juror Number 12 confirmed her husband was a musician at the church the victim's family attended. She said they did not attend the same church as the victim's family, but the two "churches fellowship[ed]

together" several times a year. She also stated she did not know which members of the church were the victims' family.

The court asked Juror Number 12 whether she could remain impartial. She agreed that she could and said she was "comfortable" proceeding. The court asked if her familiarity with Stallworth's family made her feel "ill at ease," to which she responded "[o]nly in the fact I'm kind of throwing a monkey wrench in it, not in my own actions but just because of our status in the community and people knowing us." She again confirmed she did not think this impacted her ability to be impartial, stated she could render a verdict based on the evidence, and she could remain on the jury. The court cautioned her that her husband could not speak to her about the case, and she agreed.

When asked whether she would be able to recognize Stallworth's family if they attended trial, Juror Number 12 said while their faces likely would be familiar to her, she would not necessarily know who they were. Because some members of Stallworth's family were present in court that day, the court allowed Juror Number 12 to scan the audience to see if she recognized anyone; she did not. Juror 12 stated she did not feel this connection prevented her from being fair and impartial, she did not disclose it to her fellow jurors, and it would not prevent her from voting not guilty if the State failed to prove its case beyond a

9

reasonable doubt. Following this sidebar, the court confirmed counsel was not seeking to excuse her. The court then swore in the jury.

Juror Number 12 raised a third issue on the first day of trial, following the testimony of two witnesses. She disclosed the first witness, who had found Stallworth's body and called 9-1-1, used to attend her church. She said she had a personal relationship with his mother and cousin, but that it did not impact her impartiality. Following this disclosure, both attorneys confirmed they had no objections to Juror Number 12 remaining on the panel. Notably, during voir dire, another juror had disclosed he went to high school with the witness and defense counsel also did not object to his remaining on the jury, citing the limited nature of his testimony.

On March 23, 2020, the trial was paused for several months because of the COVID-19 pandemic before resuming on June 22.

At trial, Hill testified against defendant. He acknowledged that in exchange for his testimony, his murder charge was amended to first-degree aggravated manslaughter, and he expected to receive a sentence of twenty years.[2] Hill went on to testify that in mid-January, defendant was staying with him at the Ramada Inn in Toms River and helping him sell drugs. Stallworth

---

[2] Hill was ultimately sentenced to twenty years in prison.

was their supplier. At one point Hill asked defendant if he was aware of any new suppliers and defendant introduced Hill to a new supplier in New York, whose heroin was cheaper and better quality than Stallworth's.

Hill admitted he owed Stallworth $18,000 from a prior purchase. At first, Hill intended to pay Stallworth the amount he owed him, but after Stallworth paid multiple visits to Daly at Hill's apartment, Hill decided to ask defendant to "take care of" the debt by killing Stallworth. In exchange, Hill promised to pay defendant the $18,000 he owed to Stallworth. He agreed and they decided they would kill Stallworth at Hampton Gardens using the 9-mm Ruger.

On the day of the murder, Hill called and messaged with Stallworth using his "burner" phone, a phone he used for narcotics sales, to set up the meeting at Hampton Gardens. At 7:24 p.m., Hill and defendant left the Ramada Inn to go to Hampton Gardens. Hill identified himself and defendant leaving the Ramada Inn from a still photograph grabbed from Ramada Inn surveillance footage. Hill parked in a nearby apartment complex and he and defendant walked to Hampton Gardens apartment D-4. After Stallworth informed Hill he would be arriving at the complex momentarily, Hill and defendant waited for his arrival in the parking lot.

11

Hill said they saw Stallworth arrive and enter a covered walkway that led to apartment D-4. Defendant got out of the car and approached Stallworth; the two men began talking and then entered the walkway. At 8:39 p.m., defendant's phone called Hill's personal phone. Immediately after, Hill called defendant six times in a row but could not get through to him. At 8:42 p.m., Hill finally got through to defendant, who told Hill he was standing next to Stallworth and asked where Hill was located. During this thirty-three-second call, Hill heard defendant tell Stallworth that Hill was on his way to pay the debt.

Hill testified that after the call, defendant ran toward him from the side of the building, jumped into Hill's car, and they left. Defendant said to Hill, "I got him." Before Hill left the parking lot, he pulled up to where he could see a body lying on a porch stoop. Hill drove to the Silver Ridge apartments to get rid of the 9-mm by putting it in the Grand Marquis. Defendant handed the gun to Hill, who put the gun in a Nike hat and then threw the hat into the trunk of his car in the parking lot. At 9:36 p.m., Hill and defendant returned to the Ramada Inn; and Hill again identified himself and defendant in a still grabbed from Ramada Inn surveillance footage.

Cell site location data from Hill's personal phone and burner phone was generally consistent with Hill's testimony about where he was at each point

12

during the evening of March 5. Hill testified defendant was in possession of his burner phone from around 7:30 p.m. onward. Location data from defendant's phone placed him at the Ramada Inn before 7:30 p.m. and after 9:15 p.m. and showed the phone moving south from the Ramada Inn at 7:33 p.m., but it had no location data from 7:33 p.m. until 9:15 p.m. A radiofrequency expert opined the absence of location data on defendant's phone from 7:33 p.m. to 9:15 p.m. could indicate the phone was off, on airplane mode, or using Wi-Fi for connectivity. The two phones were also tracked to the area where the Ruger 9-mm was found and then back to the Ramada Inn.

Hill testified that a few days after the shooting, they went to New York. According to Hill, defendant suggested they get matching tattoos with the slogan "Loyalty is Royalty" on their forearms. After they got the tattoos, they discussed the slogan represented their loyalty to keeping secret about Stallworth's murder. Hill showed his tattoo to the jury. Defendant also got another tattoo—a teardrop on his face—which, according to Hill, symbolized the murder of Stallworth. At trial, the State admitted a photo that allegedly depicted defendant's face before the murder without the teardrop tattoo, as well as a second photo that allegedly depicted defendant's face after the murder with the teardrop tattoo. Detective

A-0527-20

John Dotto testified for the State and identified defendant as the person depicted in the first photo.

Regarding the collection of defendant's DNA, Officer Jillian Marin of the Ocean County Sheriff's Office testified that on June 21, 2018, she was directed to take oral buccal swabs from Hill and defendant; Hill complied but defendant refused. She testified defendant said to her, "it would be worse for him if he did give a sample." Defendant ultimately consented to give a blood sample in lieu of a saliva sample.

At trial, the State also presented another informant who knew defendant's father and shared a jail cell with defendant. He testified defendant admitted to killing Stallworth. He was able to testify about details of the murder given to him by defendant including where they parked, the type of vehicle they drove, the 9-mm Ruger, the shot location, and their movements and discussions after the murder.

On June 29, 2020, the jury delivered a guilty verdict on the first four counts of the superseding indictment. The State dismissed the convicted (certain) persons count, which was not presented to the jury. On August 19, 2020, the court sentenced defendant to life without parole on Count One

(merging Counts Two and Four), and ten years on Count Three, to run consecutive with defendant's life sentence.

Defendant raises the following arguments on appeal:

POINT I

BOTH OF DEFENDANT'S STATEMENTS SHOULD HAVE BEEN SUPPRESSED IN THEIR ENTIRETY BECAUSE HE WAS IN CUSTODY WHEN QUESTIONED WITHOUT <u>MIRANDA</u> WARNINGS ON MARCH 6, WHICH RENDERED INEFFECTIVE THE WARNINGS GIVEN PRIOR TO HIS INTERROGATION ON MARCH 12.

POINT II

JUROR 12 SHOULD HAVE BEEN DISMISSED BECAUSE SHE AND HER HUSBAND KNEW THE VICTIM'S FAMILY, A STATE'S WITNESS, AND THE CHIEF OF POLICE OF THE TOMS RIVER POLICE DEPARTMENT, AND BECAUSE SHE RECEIVED INFORMATION ABOUT THE CASE FROM HER HUSBAND.  (Not Raised Below)

POINT III

THE ADMISSION OF TESTIMONY THAT DEFENDANT REFUSED A BUCCAL SWAB AND ALLEGEDLY MADE A CONTEMPORANEOUS ORAL STATEMENT AS PROOF OF CONSCIOUSNESS OF GUILT VIOLATED HIS RIGHT TO A FAIR TRIAL BECAUSE DEFENDANT ULTIMATELY CONSENTED TO A BLOOD DRAW AND HAD HONEST (THOUGH MISGUIDED) REASONS FOR OPPOSING THE BUCCAL SWAB. (Partially raised below)

15

POINT IV

THE JURY INSTRUCTIONS EMPHASIZING DEFENDANT'S RIGHT TO PROVIDE AN EXCULPATORY EXPLANATION FOR HIS TATTOOS VIOLATED DUE PROCESS AND HIS RIGHT TO REMAIN SILENT, AND THE DETECTIVE'S IDENTIFICATION OF THE PERSON WITH NO FACIAL TATTOO IN THE MARCH 5 PHOTOGRAPH AS DEFENDANT WAS INADMISSIBLE LAY OPINION TESTIMONY. (Not Raised Below)

POINT V

THE CUMULATIVE IMPACT OF THE ERRORS DENIED DEFENDANT DUE PROCESS AND A FAIR TRIAL. (Not Raised Below)

II.

Defendant first argues the trial court improperly determined his first statement was non-custodial. He then contends his entire second statement should have been suppressed as the unlawful product of the first statement. Additionally, he posits his second statement was not voluntary because the police misstated their purpose for interviewing him.

"'The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503.'"

A-0527-20

State v. S.S., 229 N.J. 360, 381 (2017) (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). "To ensure that a person subject to custodial interrogation is 'adequately and effectively apprised of his [or her] rights,' the United States Supreme Court developed constitutional safeguards—the Miranda warnings." State v. A.M., 237 N.J. 384, 396 (2019) (quoting Miranda, 384 U.S. at 467). "The failure to administer Miranda warnings prior to a custodial interrogation 'creates a presumption of compulsion,' and any unwarned statements must be suppressed—even when they 'are otherwise voluntary within the meaning of the Fifth Amendment.'" State v. Tiwana, 256 N.J. 33, 41 (2023) (quoting Or. v. Elstad, 470 U.S. 298, 307 (1985)).

When reviewing a motion to suppress statements, courts generally "defer to the factual findings of the trial court if those findings are supported by sufficient credible evidence in the record." State v. Sims, 250 N.J. 189, 210 (2022) (citing S.S., 229 N.J. at 374). Deference to a trial court's factual findings is appropriate because the trial court has the "'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" S.S., 229 N.J. at 374 (quoting State v. Elders, 192 N.J. 224, 244 (2007)). The trial court's legal conclusions, however, are reviewed de novo. State v. Hubbard, 222 N.J. 249, 263 (2015). Thus, the reviewing court is "not bound by

a trial court's interpretations of the legal consequences that flow from established facts." State v. Diaz, 470 N.J. Super. 495, 513 (App. Div. 2022).

A defendant's Miranda rights are "triggered only when a person is in custody and subject to questioning by law enforcement." State v. Ahmad, 246 N.J. 592, 610 (2021) (citing State v. Wint, 236 N.J. 174, 193 (2018)). "'Custody' for the purposes of Miranda requires a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" State v. Erazo, 254 N.J. 277, 298 (2023) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)).

Whether an interview constitutes a custodial interrogation is an objective assessment based on the totality of the circumstances, including "the duration of the detention, the place and time of the interrogation, the nature of the questions and the language employed by the interrogator, the conduct of the police, the status of the interrogator, the status of the suspect, and any other relevant circumstances." State v. Brown, 352 N.J. Super. 338, 352 (App. Div. 2002) (internal citations omitted). Notably, custody does not require "'a formal arrest,'" the use of physical restraints, or even questioning at a police station. Hubbard, 222 N.J. at 266 (quoting State v. P.Z., 152 N.J. 86, 103 (1997)). That said, "'[i]f the questioning is simply part of an investigation and is not targeted

at the individual because she or he is a suspect, the rights provided by <u>Miranda</u> are not implicated.'" <u>Ibid.</u> (quoting <u>State v. Timmendequas</u>, 161 N.J. 515, 614-15 (1999)) (alteration in original). However, because it is the objective circumstances of the interview that matter, it is not "dispositive whether police consider someone a 'suspect,' 'person of interest,' or 'witness.'" <u>Erazo</u>, 254 N.J. at 299 (citing <u>State v. Keating</u>, 277 N.J. Super. 141, 148 (App. Div. 1994)).

For a defendant's waiver of his or her <u>Miranda</u> rights to be valid, the State must prove beyond a reasonable doubt that the waiver was given knowingly, voluntarily, and intelligently. <u>Nyhammer</u>, 197 N.J. at 400-01. A court evaluates whether the State has satisfied its burden by considering the "totality of the circumstances surrounding the custodial interrogation based on the fact-based assessments of the trial court." <u>A.M.</u>, 237 N.J. at 398 (citing <u>State v. Presha</u>, 163 N.J. 304, 313 (2000)). The totality of the circumstances "requires that we 'consider such factors as the defendant's "age, education, and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved."'" <u>Sims</u>, 250 N.J. at 217 (quoting <u>Nyhammer</u>, 197 N.J. at 402).

A.

Defendant contends his first statement constituted a custodial interrogation and the detectives' failure to Mirandize him violated his right against self-incrimination. The court did not err in concluding that defendant went to the police station voluntarily. See Erazo, 254 N.J. at 299-300 (circumstances of interview supported that it was non-custodial, including that defendant rode voluntarily and unrestrained to the police station and the police viewed him as a witness). Although being transported in a police vehicle can support a finding of custodial interrogation, Hubbard, 222 N.J. at 271, there was no error in the court's finding this was a practical choice, because defendant did not have his own vehicle to transport himself.

The court also considered the circumstances of the interview itself—its short duration, defendant's relaxed demeanor, possession of his cellphone, and that the questions centered on Hill—as demonstrating that it was a non-custodial interview. See, e.g., P.Z., 152 N.J. at 103 (commenting on short duration of interview as one factor to support conclusion that interview was a non-custodial interrogation); rather, the court viewed the interview as akin to taking a witness statement. See Hubbard, 222 N.J. at 271 (noting that questioning as part of an investigation, where the individual is not a suspect, does not implicate a

20

defendant's <u>Miranda</u> rights) (citing <u>Timmendequas</u>, 161 N.J. at 614-15). Because these findings are supported by the record, we conclude that the court did not err in finding the first interview was a non-custodial interrogation that did not require <u>Miranda</u> rights.

B.

Defendant's arguments on his second statement are two-fold. Because we affirm the trial court's determination defendant was not in custody during the first statement, further discussion on suppressing the second statement as fruit of the first statement is not necessary.

Next, defendant claims the police misled him into waiving his <u>Miranda</u> rights. Here, the detectives did not directly ask defendant if Hill asked him to kill Stallworth until well into his second statement. Defendant said no and that he did not know what the detectives were talking about. At this point, defendant told the police, "I already told you what I know. That's it," followed by, "I don't even want to talk no more, bro . . . . That's it." The detectives initiated a break almost immediately after this statement, and then continued the interrogation. The court interpreted defendant's statement as invocation of his right to remain silent, and thus suppressed the remainder of defendant's interview.

21

When reviewing the totality of the circumstances of a waiver, the court may consider an officer's bad faith conduct in misleading a defendant about the purpose of the interview. Sims, 250 N.J. at 216. Such an assessment "encompasses all facts that bear not only on the interrogation tactics used by police, but also the interrogee's awareness of his or her predicament and ability to make an informed as well as voluntary decision about whether to speak to police or instead remain silent." State v. Cotto, 471 N.J. Super. 489, 518 (App. Div. 2022), certif. denied, 252 N.J. 166 (2022). Thus, a waiver is invalid if the police misled the suspect about the purpose of the interview—for instance, suggesting they were being questioned on drug charges as opposed to homicide—to "induce" the suspect into waiving their rights. Diaz, 470 N.J. Super. at 518-19, 525. The totality of the circumstances show defendant knew why he was being questioned from the outset and that the police never misled him about the substance of the interrogation. See Cotto, 471 N.J. Super. at 506-07. The trial court correctly ruled that defendant's statement was admissible in part, focusing on his Miranda waiver and whether he had later invoked his right to remain silent.

III.

Defendant next claims Juror 12 was impermissibly biased and even though trial counsel did not move or otherwise advocate for her recusal in any way, the court should have independently removed the juror. Under the Sixth Amendment of the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution, a criminal defendant has a "constitutional right to be fairly tried by an impartial jury[.]" State v. Dangcil, 248 N.J. 114, 140 (2021) (quoting State v. Little, 246 N.J. 402, 414 (2021)). This encompasses "the right to have the jury decide the case based solely on the evidence presented at trial, free from the taint of outside influences and extraneous matters." State v. R.D., 169 N.J. 551, 557 (2001) (citing State v. Bey, 112 N.J. 45, 75 (1988)). It is the trial court's obligation to ensure "'that the jury is as nearly impartial as the lot of humanity will admit.'" State v. Negrete, 432 N.J. Super. 23, 32 (App. Div. 2013) (quoting State v. Deatore, 70 N.J. 100, 106 (1976)).

The court must ensure the individual juror or jurors can "judge the facts in an impartial and unbiased manner, based strictly on the evidence presented in court." R.D., 169 NJ at 558. (quoting Bey, 112 N.J. at 87). Thus, "[t]he court is obliged to interrogate the juror, in the presence of counsel, to determine if there is a taint" and to what extent. Ibid. (citing Pressler & Verniero, Current

N.J. Court Rules, cmt. 2 on R. 1:16-1 (2000)); see also State v. Scherzer, 301 N.J. Super. 363, 487-88 (App. Div. 1997).  When a juror indicates that he may remain impartial when questioned, a reviewing court must accord that statement a "great deal of weight" and must defer to the trial court's ability to assess the sincerity and credibility of the juror.  State v. Singletary, 80 N.J. 55, 64 (1979).

An appellate court reviews the trial court's jury-related decisions for abuse of discretion.  State v. Brown, 442 N.J. Super. 154, 182 (App. Div. 2015) (citing R.D., 169 N.J. at 559).  This includes a court's determination on juror credibility and "whether he [or she] is able to sit as a fair and impartial trier of fact." Singletary, 80 N.J. at 63.  "However, 'an appellate court is not bound by a determination when the 'particular circumstances present such a strong likelihood of prejudice that, as a matter of law,' the juror should have been removed.'"  Brown, 442 N.J. Super. at 182 (quoting State v. Loftin, 191 N.J. 172, 192 (2007) (quoting State v. Biegenwald, 106 N.J. 13, 91 (1987))).

Since counsel did not object to the juror at trial, and in fact consented to her serving as a juror, we must consider whether the court's failure to remove the juror constituted plain error.  R.D., 169 N.J. at 563.  Under this standard, we must consider whether there was error and whether that error was "clearly capable of producing an unjust result."  R. 2:10-2.  Plain error in this context

means whether the error had the capacity to produce an unjust result by depriving defendant of a fair and impartial jury. Loftin, 191 N.J. at 196.

Because Juror 12 had virtually no personal relationship with the police chief, acknowledged that she would not speak with him if she somehow encountered him during trial, and could remain fair and impartial, the trial court had no duty to excuse Juror 12 on this basis. The court and counsel adequately probed the juror about her husband's limited relationship with the chief.

Next, the disclosure by the same juror that the first witness used to attend her church, is not grounds for a reversal. While important in the timing of events, his testimony was not a direct implication of defendant. The credibility of his testimony - of finding the body and calling 9-1-1 - was not in question. It appears to have been a strategic move by his counsel to let her remain on the jury. That decision did not influence the outcome of the trial.

Defendant further claims Juror 12's statement to the court that her husband had told her she might know members of the victim's extended family because they attended a church which the couple occasionally had visited, and her husband had worked there as a musician is grounds for reversal. However, the record shows that her husband did not inform Juror 12 who those family members were, she did not recognize any of Stallworth's family members who

attended the court proceedings, and she affirmed that it would not affect her impartiality.

The present circumstances differentiate this case from Fortin, on which defendant relies. In that case, the Court held it was "ill-advised," but not forbidden, to seat a juror who was acquainted with the victim's loved ones because of a "common-sense concern that someone who had met and interacted with the young children of the victim of a heinous sexual assault and murder might be incapable of impartiality." State v. Fortin, 178 N.J. 540, 629 (2004). Here, Juror 12 was only informed by her husband that she would know some extended family members of the victim if she met them, but she did not even know who they were at the time of trial. Obviously, there could be no "common-sense concern" of deep empathy for people whose identities were unknown to her.

Juror 12 did not have any relationships of significance with the State, the witnesses, or the victim. Her acquaintances were peripheral and not directly connected to any testifying witness. As such, defendant has failed to establish abuse of discretion by the court or that peripheral acquaintance with the extended family members of the victim had the capacity to produce an unjust result for declining to excuse Juror 12.

26

IV.

Defendant further argues the trial court improperly permitted testimony of Ocean County Sherriff's Officer Jilliam Marin, with respect to defendant's statement when refusing a buccal swab sample that "it would be worse for him if he did give a sample." As required by statute, the State took a buccal swab of defendant at the time of his arrest.[3] After a CODIS[4] hit suggested defendant produced the saliva found at the scene, the State moved to compel a buccal swab from him.

Preliminarily, when the State proffered this evidence before trial, defense counsel argued his refusal did not constitute a statement against interest, as defendant's objection stemmed from his confusion about why the State needed another sample from him, and therefore it would be unfair if the State could

---

[3] N.J.S.A. 53:1-20.20 requires arresting officers to take DNA or other biological samples from individuals arrested for certain enumerated offenses, including murder.

[4] CODIS stands for "Combined DNA Index System," and is "maintained in all fifty states and a number of federal agencies to collect DNA profiles to be used for, among other things, human identity testing." State v. Gathers, 449 N.J. Super. 265, n.1 (App. Div. 2017). Although testimony of a CODIS hit is not permitted at trial, it can serve as the State's basis of probable cause in a motion to compel a sample from a defendant. See Id. at 274.

A-0527-20

present evidence of defendant's refusal without mentioning that he consented to give a blood sample.

The court indicated it seemed likely the evidence was admissible but left the question to defense counsel to determine if she wished to contest the admissibility of the evidence at a N.J.R.E 104 hearing. The next day, the court addressed defense counsel and asked her if she would be contesting the admissibility of the statement, and counsel indicated she did not want to contest it and would address the statement in closing. The discussion concluded with defense counsel stating she did not think a hearing was necessary if Marin's testimony included "just that one statement and not . . . her drawing an opinion as to what he meant or what he said in court on the record after that."

Thus, at trial, Marin testified she had gone to the courthouse to obtain buccal swabs and fingerprints from Hill and defendant. She testified Hill had complied, but that defendant had "refused" the buccal swab. She testified he said, "it would be worse for him if he did give a sample."

Following this testimony, the court brought counsel for a sidebar, referencing their past discussions about Marin's testimony—including whether she would testify defendant refused—and asked whether defense counsel sought a limiting instruction pursuant to N.J.R.E. 404(b). Defense counsel declined,

stating defendant had a "reason" for not giving a sample and that she would bring this out during cross-examination. The court then instructed the jury on how to consider Marin's testimony about defendant's alleged oral statements. Defendant now contends the admission of Marin's testimony, coupled with the failure to inform the jury that defendant ultimately consented to the blood draw, in combination with incomplete jury instructions, violated due process, fundamental fairness, and deprived defendant of a fair trial.

We review a trial court's evidentiary ruling for an abuse of discretion. State v. Garcia, 245 N.J. 412, 430 (2021). The reviewing court "will not substitute [its] judgment unless the evidentiary ruling is 'so wide of the mark' that it constitutes 'a clear error in judgment.'" Ibid. However, Rule 1:7-2 provides, "[e]xcept as otherwise provided by R. 1:7-5 and R. 2:10-2 (plain error), no party may urge as error any portion of the charge to the jury or omissions therefrom unless objections are made thereto before the jury retires to consider its verdict . . . ." Thus, where an appellant fails to object to a charge, Rule 1:7-2 provides that the standard of review is plain error. State v. Torres, 183 N.J. 554, 564 (2005).

Our jurisprudence recognizes "that certain conduct may be 'intrinsically indicative of a consciousness of guilt,' and may therefore be admitted as

substantive proof of the defendant's guilt." State v. Cole, 229 N.J. 430, 454 (2017) (quoting State v. Phillips, 166 N.J. Super. 153, 160 (App. Div. 1979)). Whether consciousness of guilt evidence is admissible depends on whether the likelihood of prejudice from this evidence substantially outweighs its probative value. Ibid.

Here, the record supports a finding that both defendant's inculpatory statement and his refusal to submit to a buccal swab was probative for consciousness of guilt. The nature of his refusal is reflected in his statement to Marin—that "it would be worse for him" if he submitted a sample—suggesting awareness that his sample would reflect his guilt. Defendant's statement had probative value precisely because it evidenced consciousness of guilt.

While defendant is correct that his statement and refusal could be interpreted a different way—such as evidencing his distrust of the police or misunderstanding of police procedure—this does not warrant its suppression. It is "the jury's function to determine the appropriate inference and the weight to be given" to defendant's statement and decide whether it constituted an admission of guilt. State v. Rechtschaffer, 70 N.J. 395, 413 (1976) (noting that while a defendant's threat to kill an informant could convey his "dismay at being unjustifiably incarcerated," it also was "consonant with an inference of an

admission of guilt."). Thus, the court properly allowed the jury to review this evidence and consider how to interpret it.

Indeed, defense counsel used this evidence to defendant's benefit as she contrasted his refusal to provide a sample with Hill's, who she tried to argue was the true murderer. By contrasting Hill's shrewd avoidance of DNA contamination with defendant's innocent mistrust of police yet eventual acquiescence to a blood sample, counsel was able to paint a narrative of defendant being manipulated into being in the wrong place at the wrong time and Hill as the mastermind who committed the murder. Even if unsuccessful, counsel's strategic motivation in acquiescing to the admittance of defendant's refusal and contemporaneous statement was undeniable.

Relatedly, defendant argues "[i]t violates principles of due process and fundamental fairness" to use his refusal against him when he made his statement "in the course of litigating a motion." This argument is misleading, as defendant cites to Simmons v. United States, 390 U.S. 377, 394 (1968), a case where the State attempted to use the defendant's pre-trial testimony against him. The facts here are distinguishable because they do not involve using defendant's pre-trial testimony against him. Rather, defendant's spontaneous statement to Marin was made after the court already had directed him to provide the buccal swab.

31

Defendant next argues the likelihood of prejudice from this evidence far outweighed any probative value. Both defendant's statement and refusal were undoubtedly prejudicial—the entire point of this evidence was to suggest his guilt. While defendant's refusal undoubtedly carried a potential for prejudice, it did not outweigh the probative value of the evidence. The saliva was the only physical evidence of sufficient quality to undergo testing, and it linked defendant to the crime scene. Thus, defendant's refusal to submit to the buccal swab was both probative and prejudicial, but not unduly prejudicial. See Rechtschaffer, 70 N.J. at 413.

V.

Defendant next contends the trial court made both an evidentiary and an instructional error with respect to them getting tattoos. Defendant contends the testimony was improper because the detective who testified was not an eyewitness to the moment depicted in the photograph and had no personal knowledge of defendant's appearance without the tear drop tattoo in the first photograph. Second, defendant posits that because the defendant never has any burden of proof and has the right to remain silent rather than testify in attempt to offer an alternative, defendant's due process was violated when the court said

32

that defendant could, but was not required to, provide an alternative explanation for his tattoos.

During a pre-trial hearing, the court ruled Hill could testify that defendant had obtained tattoos to commemorate Stallworth's murder, engaging in a Cofield[5] analysis and concluding the probative value of this evidence outweighed any prejudice. Defense counsel cross-examined Hill about other possible reasons for the tattoos. After ruling on the admissibility of the tattoo evidence, the court discussed its proposed jury instruction. Neither party objected to the proposal. At trial, Hill testified consistent with his pre-trial testimony that following the murder, the parties got matching tattoos and defendant got a teardrop tattoo, all to commemorate Stallworth's murder.

Following this testimony, the court instructed the jury on how to consider this evidence. The court provided separate but similar instructions for both tattoos. First, the court instructed the jury to determine whether defendant and Hill indeed got the tattoos in question, and, if so, what those tattoos meant. The court acknowledged the possibility of "perfectly legitimate and lawful reasons" for the tattoos. For the forearm tattoo, the court instructed that having a tattoo did not make someone more likely to commit a crime, and that the jury could

---

[5] State v. Cofield, 127 N.J. 328, 338 (1992).

A-0527-20

not view the tattoo for that purpose. Rather, the jury only could determine whether the forearm tattoo reflected Hill and defendant's role in Stallworth's murder, and their commitment to keep it a secret. Similarly, the court said the teardrop tattoos were "not evidence of guilt or innocence on any charge in the indictment" and that the jury could not consider it for that purpose. The court said the State presented the teardrop tattoos as an admission that defendant had killed Stallworth, demonstrating consciousness of guilt.

With respect to both tattoos, the court instructed "[t]he defense may, but is not required, to offer an alternative explanation" for the tattoos. At trial, after the charge and unlike in the pretrial hearing, defense counsel did not probe Hill for other reasons why someone may get a teardrop tattoo. Instead, during summation, she disputed Hill's credibility, noted that many people, including celebrities, had teardrop tattoos, and thus questioned whether this meant that they were "all murderers," or whether it could "mean something else[.]"

Certain jury instructions are so crucial to a jury's deliberations that error is presumed to be reversible. State v. McKinney, 223 N.J. 475, 495 (2015). "An erroneous jury charge 'when the subject matter is fundamental and essential or is substantially material' is almost always considered prejudicial." State v. Maloney, 216 N.J. 91, 104-05 (2013) (quoting State v. Green, 86 N.J. 281, 291

(1981)).  However, as noted above, where an appellant failed to object to the charge below, the jury instruction is reviewed for plain error.  Torres, 183 N.J. at 564.  This error must prejudicially affect defendant's substantial rights, must be "sufficiently grievous" to warrant consideration by the appellate court, and have "a clear capacity to bring about an unjust result."  State v. Montalvo, 229 N.J. 300, 321 (2017) (quoting in the second instance, State v. Chapland, 187 N.J. 275, 289 (2006)).

Defendant now contends the court should have instructed the jury about alternate explanations only if defendant first had proffered such an alternate explanation.  Otherwise, defendant contends, the instruction creates an expectation that defendant will refute the State's claim and improperly shifted the burden to him to present exculpatory evidence about the tattoos, in violation of his right to remain silent.

Because the court had reason to believe defendant would be posing alternative explanations for his teardrop tattoo at the time it gave its instruction, defense counsel agreed to the charge, and counsel indeed alluded to an alternate theory during summation, there was no error in the court's instruction on the teardrop tattoo.  Moreover, while defense counsel had posed no alternative explanation for defendant's forearm tattoo, the court's instruction about that

tattoo was not capable of producing an unjust result.  The court's instruction made clear defendant was not required to provide exculpatory evidence.  The court in no way suggested defendant's failure to provide an alternate explanation reflected his guilt or that he bore such a burden.  Rather, the court's instruction about the teardrop tattoo, read as a whole, severely limited how the jury could consider this evidence.

The court's instruction on the forearm tattoo is a different matter.  Defense counsel never suggested an alternative meaning for the forearm tattoo.  At most, she argued the jury should reject Hill's proffered rationale for this tattoo, because he was an unreliable witness.  Thus, we conclude the court's instruction was erroneous.  However, this error does not warrant reversal.  First, the language of the jury instruction was open ended, and did not place an affirmative burden on defendant to refute the State's testimony.  Rather, it directed the jury on how it should consider this alternative explanation, if proffered.  Second, given the weight of the evidence against defendant—including the positive DNA match, Hill's testimony, recovery of the weapon, his cellmate's testimony of his confession, and the cell phone data—the erroneous instruction was not capable of producing an unjust result and did not impact the outcome of the trial.

A-0527-20

Defendant next argues Detective Dotto's identification of defendant violated N.J.R.E. 701 because Dotto was not an eyewitness and had no personal knowledge of defendant's appearance on the date the picture was taken. Prior to Hill's testimony, Detective Dotto, who had conducted the forensic examination of the cell phones, authenticated various pieces of digital evidence including, a video created on March 5, 2018, which showed defendant without a tear drop tattoo and a photograph taken after the homicide that showed defendant with the tear drop.[6] Hill later testified about the dates these photographs were taken, ostensibly to demonstrate defendant did not have the teardrop tattoo until after the homicide. Before publishing the photographs to the jury, the court instructed that Dotto had authenticated the photographs "only to extent of his testimony," meaning that the two photographs were "extracted from certain electronic devices." It also reminded the jury that they were the judges of the facts.

A trial court's evidentiary ruling is reviewed under the abuse of discretion standard. Garcia, 245 N.J. at 430. Under this deferential standard, appellate courts "review a trial court's evidentiary ruling only for a 'clear error in

---

[6] The record on appeal does not include the photographs.

judgment.'" State v. Medina, 242 N.J. 397, 412 (2020) (quoting State v. Scott, 229 N.J. 469, 479 (2017)).

The admissibility of lay opinion testimony is governed by N.J.R.E. 701. "The first prong of N.J.R.E. 701 requires the witness's opinion testimony to be based on the witness's 'perception, . . . .'" State v. Singh, 245 N.J. 1, 14 (2021) (quoting State v. McLean, 205 N.J. 438, 457 (2011)). The second prong limits lay-witness opinion to "testimony that will assist the trier of fact either by helping to explain the witness's testimony or by shedding light on the determination of a disputed factual issue." McLean, 205 N.J. at 458. Dotto's inadvertent identification satisfies neither of these prongs. Here, there is no claim Dotto either witnessed the events of the photograph or that he had any direct familiarity with defendant. Consequently, his identification violated N.J.R.E. 701(a). Without directly witnessing the events of the photograph or absent any prior knowledge of defendant, the issue of identity was for the jury to determine. State v. Higgs, 253 N.J. 333, 366-67 (2023).

Although Dotto's identification was erroneous, it was not raised below and was not clearly capable of producing an unjust result. R. 2:10-2. Neither defendant's identity nor the existence of his tattoos were at issue; the jury could observe the tattoo on defendant's face throughout the trial. Moreover, during

pre-trial proceedings, defendant's objection to evidence of the tattoos focused on the significance of the tattoos, not the existence of the tattoos themselves. It follows that Dotto's statement was not offered to establish the identification itself, but that it reinforced Hill's timeline about when defendant got the teardrop tattoo.

The State presented other evidence on this point. First, it presented text messages from Hill to a friend from March 8, 2018, stating he was getting tattooed and that he was with defendant, corroborating that the tattoos came after the murder. Second, Hill had identified both photographs of defendant—both pre- and post-tattoo—including identifying when they were taken. Finally, the court's jury instruction appropriately framed Dotto's testimony as relating only to the extraction of the photographs, but not the substance of the photographs. Thus, although Dotto's statement was improvidently admitted, because it "echoed" Hill's identification testimony, any error was harmless as it could not produce an "unjust result." State v. Cotto, 182 N.J. 316, 331 (2005).

VII.

Defendant submits the cumulative effect of these errors requires reversal. State v. Orecchio, 16 N.J. 125, 129 (1954); U.S. Const. amends. VI and XIV; N.J. Const. art. I, ¶¶ 1, 9, 10. See also State v. Sanchez-Medina, 231 N.J. 452,

455 (2018) (vacating and remanding on cumulative error where jury instruction omitted charge on "key issue" and where jury heard inadmissible, prejudicial testimony).  Even when an individual error or series of errors do not rise to reversible error, if when considered in combination, their cumulative effect casts sufficient doubt on a verdict, reversal may be warranted.  State v. Jenewicz, 193 N.J. 440, 473 (2008).  Given the strength of the State's evidence against defendant, the errors, even viewed cumulatively, do not warrant reversal.

To the extent we have not addressed any of the defendant's remaining arguments, they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

40

A-0527-20